UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SMARTSTREAM TECHNOLOGIES, INC.,  :     Case No. 1:17-cv-02459

               Plaintiff,  :     Judge Vernon S. Broderick
                       Magistrate Judge Henry B. Pitman

    -against-  :     **PLAINTIFF'S STATEMENT OF**

PHILIPPE CHAMBADAL,  :     **UNDISPUTED MATERIAL FACTS
PURSUANT TO LOCAL CIVIL
RULE 56.1**
           Defendant.  :

                              :
                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFF'S STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Local Civil Rule 56.1, Plaintiff SmartStream Technologies, Inc.

("SmartStream") respectfully submits this statement of undisputed material facts in support of its

motion for summary judgment.

    **A.    Defendant Becomes CEO of SmartStream and Agrees To Protect the
           Confidentiality of SmartStream's Information and to Return SmartStream
           Property Upon Demand.**

    1. SmartStream is a privately held global software and managed services provider whose post-

trade processing solutions, together with its unique data management services, creates a real-time

and pre-emptive approach to reducing trade failures while also accelerating and automating trade

processes. (*See* Verified Complaint, ECF No. 2 ("Cmpt."), ¶ 5).

    2. Defendant Philippe Chambadal ("Defendant") is a self-described "senior financial

technology executive with over 30 years of experience." (Counterclaims filed with this Court on

May 24, 2017 (ECF No. 30) ("Counterclaims"), ¶ 5). Defendant currently serves "as a director for

several highly successful technology companies and as an advisor to private equity funds."

(Counterclaims, ¶ 14).

3. Around December 2007, Defendant began serving on the Board of Directors of SmartStream. (Deposition of Defendant Chambadal ("Def. Dep."), 21:2-18). Through this role, Defendant directed "company strategy and transform[ed] the company according to [his] plan." (*Id.*)

4. Effective June 29, 2011, Defendant became the Chief Executive Officer of SmartStream. (Plaintiff's Exhibit at the Deposition of Defendant ("Dep. Ex.") 11 (the "Offer Letter"); Def. Dep., 120:7-23). Defendant maintained his role on the Board of Directors while serving as CEO. (Def. Dep., 30:14-23.)

5. While Defendant maintained his roles at SmartStream, Defendant also served on the Board of Directors for other companies such as Quantal, ETI, Cube, and Custom Matrix. (Def. Dep., 21:19-22:2, 23:5-14, 116:3-17). Defendant has received shares of stock in Quantal and Cube in exchange for providing board services. (Def. Dep., 163:8-24).

6. Defendant's starting salary at SmartStream was ███ (Def. Dep., 25:14-16.) At some point, Defendant's annual salary increased to ███. (*Id.*)

7. At the outset of his role, Defendant agreed to certain terms and conditions of his employment, as outlined by SmartStream in the Offer Letter dated June 22, 2011. (Def. Dep., 120:8-19; Dep. Ex. 11). Of note, the Offer Letter states "All equipment, material, written correspondence, memoranda, communication, reports, or other document pertaining to the business of SmartStream Technologies Inc., used or produced by you in connection with your employment, or in your possession or under your control shall at all times remain the property of SmartStream Technologies, Inc." (Dep. Ex. 11).

8. Defendant recalls agreeing at the outset of his employment that he would return all SmartStream property upon demand by SmartStream. (Def. Dep., 119:24-120:6; Def. Responses to Requests For Admission ("RFA Response", No. 9, attached hereto as Exhibit A).

9. On July 21, 2015, Defendant entered into the Employee Agreement Regarding Confidential and Non-Competition and Proprietary Rights (the "Agreement'), through which SmartStream states it will employ Defendant on an at-will basis and provide Defendant with access to the Company's confidential information. (Cmpt., Ex. A at Preface and ¶ 16). Defendant in turn promised to maintain the confidentiality of SmartStream's "Proprietary Information" and to return all SmartStream property upon request by SmartStream. (*See* Cmpt., Ex. A at ¶¶ 2-3; RFA Response, No. 5:

> 5.      Admit that you signed the SmartStream Technologies, Inc. Employee Agreement Regarding Confidentiality and Non-Competition and Proprietary Rights, dated July 21, 2015, attached hereto as Exhibit A.
>
> **<u>Response:</u>**      Admit.

10. The Agreement states, "I understand that during the course of my employment with SmartStream Technologies, Inc. ('Company'), I will have access to and may develop confidential information belonging to the Company." (Cmpt., Ex. A).

11. Defendant further acknowledged, "This Agreement is entered into by me voluntarily and for good and valuable consideration (including my employment with the Company) the adequacy of which consideration I hereby acknowledge." (*Id.*)

12. Defendant acknowledged, "This Agreement will be binding upon me and my heirs, executors, administrators, and legal representatives . . . .." (Cmpt., Ex. A at ¶ 10).

13. In regard to Defendant's confidentiality obligations, the Agreement states in pertinent part:

> **I understand and agree that my employment with the Company creates and has created a relationship of confidence and trust between me and the Company with respect to all Proprietary Information, including confidential information of others such as clients, alliance partners and suppliers with which the Company has a current or potential business relationship. At all times, both during my employment with the Company and after its termination, I will keep in confidence and trust all Proprietary Information, and will not use or disclose any such Proprietary Information without the prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties for the Company and as authorized by the Company. The restrictions set forth in this Section 2 will not apply to non-proprietary information which is generally known to the general public, unless such knowledge results from an unauthorized disclosure by me or a party other than Company.**

(Cmpt., Ex. A at ¶ 2) (emphasis in original)

14. The Agreement defines "Proprietary Information" as

> non-public information (in all forms, including, digital, electronic, audio, visual, and paper based forms) which the Company possesses or has possessed from time to time, irrespective of whether the Company or another party (including any parent, subsidiary or affiliate of the Company worldwide) has any right, title or interest therein. Proprietary Information includes, by way of example and without limitation, trade secrets, ideas, designs, configurations, processes, techniques, formulas, software, improvements, inventions, data, know-how, copyrightable materials, patentable materials, trademarks/service marks, business and marketing plans and strategies, sales and financial reports and forecasts, and supplier lists, alliance partner lists and client lists. Proprietary Information also includes, without limitation, work and information developed by me in the course of my employment by the Company . . . .

(Cmpt., Ex. A at ¶ 1(a)).

15. In regard to Defendant's return of property obligations, the Agreement states in pertinent

part:

> All documents, records, apparatus, equipment and other intangible or tangible property (in all forms, including, digital, electronic, audio, visual, and paper based forms), whether or not pertaining to

> Proprietary Information, which are or have been furnished to me by the Company or are or have been produced by me in connection with or in furtherance of my employment with the Company are and will remain the sole property of the Company. I will return to the Company all such property as and when requested by the Company and keep no copies. In any event, I will return all such property immediately upon termination of my employment for any reason and I will keep no copies.

(Cmpt., Ex. A at ¶ 3).

16. Defendant admits that he accessed SmartStream's confidential information throughout his employment. (RFA Response, No. 3).

17. Defendant admits he agreed to treat SmartStream information in a confidential manner and to not use such information outside the scope of his SmartStream employment. (RFA Response, No. 10).

**B.** **Defendant Accesses SmartStream's Highly Confidential and Proprietary Information Throughout his Employment.**

18. Defendant held the CEO role until around spring 2016, when he transitioned into a non-executive President role. (Declaration of Haytham Kaddoura, ("Kaddoura Dec."), at ¶ 5).

19. By the end of his tenure as CEO, Defendant was running an 800-employee company. (Def. Dep., 30:9-13).

20. Some of Defendant's duties as CEO included authorization of hires, decision-making related to capital expenditures, explaining SmartStream's services to customers, pitching SmartStream's "back office efficiency" services to potential clients, preparing business strategies on behalf of SmartStream and communicating them to the high level management team, discussing competitive positioning and presenting the same to the Board of Directors, and preparing sales plans, which addressed which segments of the market SmartStream would target and how. (Def. Dep., 30:14-33:14, 73:1-16, 75:3-24).

### 1. Defendant Uses SmartStream Property To Accesses Confidential SmartStream Information.

21. SmartStream issued to Defendant a MacBook and a Blackberry (the "SmartStream Devices") in order for Defendant to perform his duties as SmartStream's CEO. (RFA Response, Nos. 1-2).

22. Defendant admits he used the SmartStream Devices to access SmartStream confidential information. (RFA Response, No. 4).

23. As Defendant traveled approximately "60 percent" of his time as CEO of SmartStream, Defendant frequently worked remotely using the SmartStream Devices. (Def. Dep., 94:6-12).

24. Defendant saved SmartStream documents locally to his MacBook. (Def. Dep., 96:9-14). Defendant used an external storage drive to backup files otherwise saved locally on his MacBook. (Def. Dep., 96:20-97:13). Defendant estimates that he backed up his MacBook onto an external backup drive approximately once per month. (Def. Dep. 97:3-5).

25. Defendant also used his family's home computer, an Apple iMac, to access and send documents containing SmartStream confidential information, such as customer contracts and fee arrangements. (Def. Dep., 97:19-100:7; *see also* Def. Dep., 67:5-68:13). For example, Defendant at times scanned a signed customer contract or fee arrangement to his personal iMac, uploaded it to his personal Gmail account, and then forwarded it on to his SmartStream email account. (Def. Dep., 100:2-10).

26. Defendant regularly signed SmartStream's customer contracts, which contain confidential price and fee (including service or software fee) information that SmartStream protects as proprietary and confidential. (Def. Dep., 67:5-68:13, 98:12-21; Dep. Ex. 4; *see also* Kaddoura Dec. ¶ 8-10). An example of one such fee arrangement contained in a client contract is the "Confidential – Contract Price" Contract Addendum (Dep. Ex. 4). (*Id.*)

27. The customer contract pricing information contained in Dep. Ex. 4 is economically valuable to SmartStream as business information contributing to its competitive advantage. (Kaddoura Dec. ¶ 10). The information is known only by SmartStream and the signing customer, which is what makes the information valuable. (*Id.*) Even within SmartStream, access to customer contract pricing information is restricted to the sales, commercial, and legal review teams. (*Id.*) SmartStream furthermore expends time and money in the development and protection of this pricing information. (*Id.*) This pricing information is an example of "Proprietary Information" as contemplated by Section 1(a) of the July 21, 2015 Employee Agreement Regarding Confidential and Non-Competition and Proprietary Rights entered into by Defendant (the "Agreement"). (*Id.*) SmartStream's customer or client contract pricing information in the hands of a competitor could allow the competitor to undercut SmartStream's sales and/ or steal SmartStream's business. (*Id.*)

28. The materials created by, presented to, and reviewed by the SmartStream Board of Directors and RDU Board of Directors likewise generally contain SmartStream's confidential information. (Kaddoura Dec. ¶ 11). RDU refers to SmartStream Reference Data Utility, of which SmartStream is a 55.03% owner. (*Id.* at ¶ 8). As a member of the Board, Defendant attended Board of Directors meetings and was therefore provided and accessed such information as a matter of course. (Def. Dep. 51:21-25).

29. One such presentation to the RDU Board of Directors, the RDU December 2016 Board Meeting presentation, contains confidential proposed pricing terms for prospective deals, target clients, service fee information, and internal project costs incurred for each customer project. (Def Dep., 51:2-25, 57:8-58:20; Dep. Ex. 2; Kaddoura Dec.¶ 14). The page marked SmartStream000008 specifically discloses highly confidential service fees and project costs relating to a Deutsche Börse deal. (Kaddoura Dec. ¶ 14).

30. The financial information contained in Dep. Ex. 2 is economically valuable to SmartStream as strategic business information contributing to its competitive advantage. (Kaddoura Dec. ¶ 15). The information is strictly confidential, which forms the basis for its independent economic value. (*Id.*) SmartStream limits access to this Dep. Ex. 2 information to the RDU Board of Directors and key SmartStream executives. (*Id.*) SmartStream furthermore expends time and money in the development, aggregation, and protection of this information. (*Id.*) This information is an example of "Proprietary Information" as contemplated by Section 1(a) of the Agreement. (*Id.*) This information, especially the target client and pricing strategy information, in the hands of a competitor, would be detrimental to SmartStream because it would allow competitors to undercut SmartStream's competitive positioning. (*Id.*)

31. Similarly, the Financial Results September 30, 2016 Board Meeting Presentation contains a wealth of proprietary and confidential information, including SmartStream's revenues over time, broken down by client, revenue by product line, and delinquent payments by client (Def. Dep., 106:5-109:25, 100:11-21; Dep. Ex. 8; Kaddoura Dec.¶ 12).

32. This revenue and client information contained in Dep. Ex. 8 is economically valuable to SmartStream as strategic business information contributing to its competitive advantage. (Kaddoura Dec. ¶ 13). SmartStream limits access of this information to the Board of Directors, Finance executives, and SmartStream's shareholder. (*Id.*) The secrecy of this information forms the basis for its value. (*Id.*) For example, this information in the hands of a competitor would allow a competitor to undercut SmartStream's sales and customer relationships, steal SmartStream's pricing structure and deal pipeline, and overall damage SmartStream's market position. (*Id.*) SmartStream furthermore expends time and money in the development, aggregation, and

protection of this information. (*Id.*) This information is an example of "Proprietary Information" as contemplated by Section 1(a) of the Agreement. (*Id.*)

33. Defendant also accessed documents subject to limited distribution, such as monthly Financial Reports. (*See, e.g.*, April 2016 Finance Report at Dep. Ex. 6, which is marked "Finance Report – Confidential", and "For distribution to the Board and ICD only"; Def. Dep. 76:7-77:24, 80:9-86:14). ICD stands for Investment Corporation of Dubai, the parent company of SmartStream. (Kaddoura Dec. ¶ 4). Although stating the Finance Report contains some publicly available information, Defendant admits it also contains highly confidential information such as sales quotas and sales performance by SmartStream employees, SmartStream's actual and expected revenues by client, contract values by customer, SmartStream's financial backlog by customer, and SmartStream's sales and deal pipelines. (Def. Dep. 76:7-77:24, 80:9-86:14, 100:11-101:3; *see also* Kaddoura Dec. ¶ 16; Dep. Ex. 6).

34. This specific financial and client information contained in Dep. Ex. 6 is economically valuable to SmartStream as strategic business information contributing to its competitive advantage. (Kaddoura Dec. ¶ 18). SmartStream limits access of this information to the Board of Directors, Finance executives, and SmartStream's shareholder. (*Id.*) The secrecy of this information forms the basis for its value. (*Id.*) For example, this information in the hands of a competitor would allow a competitor to undercut SmartStream's sales and customer relationships, steal SmartStream key salespeople, steal SmartStream's pricing structure and deal pipeline, and overall damage SmartStream's market position. (*Id.*) SmartStream expends time and money in the development, aggregation, and protection of this information. (*Id.*) This information is an example of "Proprietary Information" as contemplated by Section 1(a) of the Agreement. (*Id.*)

35. As a general matter, SmartStream's deal pipeline is of critical strategic value to SmartStream, as it shows key progress and evolution of potential deals with clients and customers throughout the sales cycle. (Kaddoura Dec. ¶ 17). Pipeline information in the hands of a competitor would allow the competitor to undercut or prevent SmartStream from entering into a deal or sale with a customer. (*Id.*) SmartStream restricts access to deal pipeline information to individuals in sales roles who update the pipeline as they progress through the sales cycle, along with key finance employees and executives for budgeting and management purposes. (*Id.*)

36. Defendant testified that at least two forms of SmartStream data he accessed through his employment with SmartStream constitute obvious trade secrets: the amounts charged by and/ or paid to SmartStream by client or customer, and pipelines for new deals. (RFA Response, No. 33; Def. Dep., 100:11-101:3, 101:17-102:17; *see also* Dep. Ex. 2 at SmartStream00008 (target client and pricing strategy, and service fees and project costs), Dep. Ex. 4 at SmartStream000003 (customer contract containing software fee and payment schedule), Dep. Ex. 6 at SmartStream000095-97, 101-02, 104-106 (contract values by client, actual and expected revenue by client, financial backlog by client and estimated closing, and deal pipeline by salesperson), Dep. Ex. 8 at SmartStream000042 (revenue over time by client).

37. The information described *supra* ¶¶25-36 (herein after referred to as "Protected Information") is extremely valuable to SmartStream as strategic business information contributing to its competitive advantage. (Def. Dep. 100:11-101:3, 101:17-102:17, 130:24-131:3; Kaddoura Dec. ¶¶ 8-18). As discussed *supra*, SmartStream limits access to and distribution of the Protected Information, as its economic value depends in large part on its secrecy. SmartStream expends time and money in the development, aggregation, and protection of the Protected Information.

### 2. SmartStream Takes Measures To Protect the Secrecy of the Protected Information.

38. Based on the proprietary and competitive nature of SmartStream's business, SmartStream protects the secrecy of its confidential information, including the Protected Information, using various means. For example, SmartStream required Defendant to execute the Agreement, which obligates Defendant to adhere to strict confidentiality and return of property provisions. (Cmpt., Ex. A).

39. SmartStream likewise requires all employees who have access to SmartStream's financial information, including client fee arrangements and client revenues, deal information, or technical information, to enter into confidentiality agreements. (Kaddoura Dec. ¶ 27).

40. SmartStream also protects its confidential information and trade secrets (including the Protected Information) through other means, such as: classifying levels of information and limiting access and distribution to those individuals with a need to know the information (*see, e.g.*, Dep. Exs. 4, 6; *see also* Kaddoura Dec. ¶ 16, 27); requiring SmartStream employees to execute confidentiality and non-disclosure agreements (Cmpt., at Ex. A; *see also* Kaddoura Dec. ¶ 27); password-protecting SmartStream devices and requiring regular password changes (Kaddoura Dec. ¶ 26); adopting written policies governing employee use of SmartStream's electronic information, including Information Security and IS Acceptable Use policies (Kaddoura Dec. ¶ 28); and using a secure internal file share sites. (Cmpt., ¶ 10; *see also* Kaddoura Dec. ¶ 29).

41. By way of further example, documents containing confidential client or partner information, along with documents containing highly confidential SmartStream financial information (such as those at Dep. Exs. 4 and 6) are explicitly marked "Confidential." In the case of financial reports, SmartStream directs recipients to refrain from distributing such material to

anyone outside the Board of Directors and/ or ICD via printed directions in large bold font on the front cover. (Dep. Ex. 6).

**C.** **After SmartStream Notifies Defendant of His Termination of Employment, Defendant Copies, Deletes, and Misappropriates SmartStream Data, and Refuses to Return SmartStream Property.**

42. On January 5, 2017, SmartStream notified Defendant his employment was being terminated. (Kaddoura Dec. ¶ 6).

43. SmartStream provided 90 days' written notice of the termination decision to Defendant, and Defendant remained on garden leave until his termination was effective April 4, 2017. (RFA Response, No. 44 and Ex. B). Defendant admits he timely received this written notice (the "Letter"). (*Id.*).

44. Also on January 5, 2017, SmartStream directed Defendant to refrain from conducting any business relating to SmartStream, specifically advising that Defendant should not have any dealings or contact with SmartStream's clients or customers. (RFA Response, Ex. B). SmartStream also demanded return of all SmartStream property by January 12, 2017. (*Id.*; *see also* RFA Response No. 11: "Admit that SmartStream requested return of its property by January 12, 2017 on or around January 5, 2017. **Response**: Admit."). As Defendant continued to receive pay on "garden leave," SmartStream reminded Defendant that he should not work in any capacity for any other person, company, or entity. (RFA Response, Ex. B). SmartStream reminded Defendant of his ongoing confidentiality obligations under the Agreement. (*Id.*)

45. On January 9, 2017, SmartStream again contacted Defendant, reminding him that it required return of SmartStream's property, specifically calling out "IT equipment, passwords and building passes." (Dep. Ex. 12; Def. Dep., 121:6-21).

46. Although Defendant initially stated he would return SmartStream's property by January 10, 2017, in contravention of the Agreement, Defendant refused to return any SmartStream property (including the SmartStream Devices). (Dep. Exs. 12-13; Def. Dep., 122:7-123:8, 124:4-15; Cmpt., Ex. A at ¶ 3; *see also* RFA Response No. 12):

> 12.     Admit that you failed to return all of SmartStream's property by January 12, 2017.

> **Response**:     Admit.

47. In contravention of the Agreement, Defendant remained in possession of SmartStream's property, including confidential and proprietary information, after SmartStream demanded its return. (Cmpt., Ex. A at ¶¶2-3; Def. Dep., 124:10-23; RFA Response Nos. 33-34):

> 33.     Admit that you were in possession of SmartStream's trade secrets after January 12, 2017.

> **Response:**     Admit.

> 34.     Admit that SmartStream did not give you permission to retain its Confidential Information after January 12, 2017.

> **Response:**     Admit that SmartStream demanded its Confidential Information back by January 12, 2017.

48. Instead of returning the MacBook, Defendant—without permission from SmartStream—used the MacBook to: delete files, access cloud storage sites, and copy/ back up documents to an external storage device. (RFA Response Nos. 20, 23, 25, and 29).

49. On January 10, 2017, Defendant used the MacBook to visit Google Drive, which is an online website used to upload or transfer files.  (Expert Report of The Computer Forensics Practice, LLC ("CFP Report"), attached hereto as Exhibit B, at 5).

50. On January 17, 2017, SmartStream again requested return of its property. (Cmpt., Ex. C).

51. Instead of returning the SmartStream property, Defendant, on January 17, 2017 again used the MacBook to visit Google Drive. (CFP Report, at 5).

52. With the MacBook still in his possession, on January 27, 2017, Defendant sent an email with an attachment labeled "STL Corporate Q4 2016.pptx" to an outside individual not employed by or affiliated with SmartStream. (Declaration of Lacey Walker of CFP ("Walker Dec."), at ¶ 7; *see also* Ex. A to Walker Dec., Kaddoura Dec. ¶ 20).

53. Of note, the attachment contains detailed, highly confidential Financial slides disclosing SmartStream's total contract values identified by customer and client, and new SmartStream bookings identified by client and revenue, and financial forecasts. (Walker Dec., Ex. A; Kaddoura Dec. ¶ 19). Such information is extremely valuable to SmartStream and is detrimental to SmartStream in the hands of an outsider or competitor. (Kaddoura Dec. ¶ 19). Such information is economically valuable to SmartStream as strategic business information contributing to its competitive advantage. (*Id.*) This information is not shared with anyone outside of SmartStream, which forms the basis of its value. (*Id.*) For example, the Financial slides containing information on financial projections and named client data, in the hands of a competitor, would allow the competitor to undercut SmartStream's client relationships and sales, and damage SmartStream's market position. (*Id.*) SmartStream furthermore expends time and money in the development, aggregation, and protection of this information. (*Id.*) This information is an example of "Proprietary Information" as contemplated by Section 1(a) of the Agreement. (*Id.*)

54. On February 1, 2017, Defendant again visited Google Drive on the MacBook. (CFP Report, at 5).

55. On February 1, 2017, SmartStream's counsel emailed Defendant's counsel to again request return of the MacBook and all SmartStream property by February 3, 2017. (Cmpt., at ¶ 18 and Ex.

D). Defendant's counsel responded, stating that counsel's "self-imposed deadlines and threats are merely a side-show." (*Id.*).

56. SmartStream's counsel reaffirmed SmartStream's demand for all SmartStream property, but Defendant's counsel announced that his firm would unilaterally take custody of the SmartStream Devices and have a third party of his choosing take a mirror image of "all storage devices." (*Id.* at ¶ 19 and Ex. D at 2).

57. On February 2, 2017, Defendant again visited the file upload site Google Drive on the MacBook. (CFP Report, at 5).

58. On February 3, 2017, SmartStream's counsel unambiguously informed Defendant's counsel that SmartStream did not consent to the law firm's retention of the MacBook and did not consent to having the firm or Defendant having mirror images made by anyone. (*Id.* at ¶ 20 and Ex. D at 12).

59. SmartStream's counsel also informed Defendant's counsel that CFP would retrieve the SmartStream Devices on February 7, 2017. (Cmpt., Ex. D at 12.)

60. On February 4, 2017, an external storage device labeled "Time Machine Backups" was plugged into the MacBook, and the MacBook's TimeMachine backup data was backed up (i.e. copied) onto the external storage device. (CFP Report, at 4-5).

61. The MacBook's TimeMachine backup program allows for data and documents on the MacBook to be backed up onto the program, as to allow further back-up (i.e. copying) to a remote device. (*Id.*) The external device used by Defendant to store TimeMachine Backups of the MacBook (the "TimeMachine Backups" storage drive) contained 857.1 GB of data. (*Id.*) (A detailed description of the SmartStream confidential and proprietary content contained on the TimeMachine Backups storage drive is addressed *infra* at ¶¶ 93-96.)

62. Also on February 4, 2017, Defendant Googled "how to remove web log files on the mac." (CFP Report, at 5).

63. On February 7, 2017, Defendant apparently turned over the SmartStream Devices to his attorney. (Affidavit of P. Chambadal, ECF No. 26 ("Def. Aff."), ¶6; *see also* Affirmation of Jonathan Sack, ECF No. 27 ("Sack Aff."), ¶ 16).

64. Also on February 7, 2017, Lacey Walker of The Computer Forensics Practice, LLC ("CFP") went to the offices of Defendant's attorney to retrieve the SmartStream Devices. (CFP Report, at 3). Defendant's counsel informed Mr. Walker it would not release the SmartStream Devices. (*Id.*)

65. On February 8, 2017, when SmartStream learned of Defendant's refusal to return the SmartStream Devices to CFP, SmartStream's counsel communicated its "final attempt to informally retrieve the Company's property." (Cmpt., Ex. D at 9).

66. On February 10, 2017, Defendant's attorney had a mirror image of the MacBook taken (i.e. **copied all contents of the MacBook**), in complete disregard of SmartStream's demand that Defendant return the SmartStream Devices to SmartStream and refrain from copying any information, including by taking a mirror image. (*Id.*; Sack Aff., ¶ 22).

67. Between February 1 and February 13, 2017, the files listed in Exhibit 2 to Lacey Walker's Declaration at ECF No. 14-1, including 78 word, excel, PDF, and Powerpoint files, were deleted from the MacBook. (ECF No. 14-1, at ¶ 11, Ex. 2). Some of these documents deleted from the MacBook while in Defendant's possession were proprietary to SmartStream and contained business strategy and financial information. (Kaddoura Dec. ¶ 33).

68. On February 13, 2017, based on Defendant's repeated and ongoing refusal to return the SmartStream Devices (which contained a wealth of SmartStream proprietary information),

SmartStream was forced to file an action for replevin in the Supreme Court of the State of New York. (*See* ECF No. 28-1, at Exhibit AA).

69. On February 16, 2017, CFP obtained possession of the SmartStream Devices. (CFP Report, at 3).

70. CFP conducted a forensic analysis of the MacBook. (CFP Report). Of note, CFP identified 1,308,962 files and/ or folders contained on the MacBook hard drive, including 1,200 Word documents, over 1,000 PowerPoint presentations, over 1,000 Excel spreadsheets, and over 2,600 PDF files. (CFP Report, at 4).

71. CFP also confirmed the presence of a litany of SmartStream and SmartStream's partner or client documents on the MacBook, which Defendant and his counsel retained possession of for **six weeks** after SmartStream demanded its return. (CFP Report, at 6-7 and Appx. C; *see also, e.g.*, Def. Dep., 51:2-25, 57:8-58:20 (Dep. Ex. 2); Def. Dep., 68:14-70:14 (Dep. Ex. 5)[1]; Def. Dep., 106:2-109:25 (Dep. Ex. 8)). Even without regard to the proprietary and confidential nature of the documents Defendant improperly retained (discussed *infra* ¶¶ 93-96), Defendant violated the Agreement through his prolonged retention of both the MacBook itself and the incredibly high volume of SmartStream documents contained thereon. (Def. Dep., 124:20-23; Cmpt., Ex. A at ¶ 3; CFP Report, at 6-7 and Appx. C).

**D.     On April 13, 2017 This Court Issues a TRO, Which Defendant Violates.**

72. On April 13, 2017, this Court issued a Fed. R. Civ. P. 65 temporary restraining order against "Defendant and his agents." (ECF No. 16 (the "TRO")).

73. Through the TRO, this Court specifically enjoined Defendant and his agents from accessing, reviewing, disclosing or using in any way any "confidential information, trade secrets,

---

[1] CFP inadvertently marked this as Dep. Ex. 6, although the "Deutsch Validate.Trade – SmartStream.pptx" document bates labeled at SmartStream000187 is in fact Dep. Ex. 5, not Dep. Ex. 6. (Walker Dec. ¶ 9).

documents or data (and any backups, images or other copies and metadata): that reside or resided on any company-provided computer, email system, network, or other system or device; or that Defendant otherwise possessed by virtue of his positions with SmartStream Technologies, Inc. and/ or its affiliates (collectively, 'SmartStream'); or that otherwise belong to SmartStream." (TRO, at ¶ 1).

74. This Court furthermore enjoined Defendant and his agents from "[t]ransferring, copying, altering, deleting, or otherwise disturbing the status of" any such data or documents referenced in Paragraph 1 of the TRO. (TRO, at ¶ 2).

75. This Court ordered Defendant to affirmatively turn over all "physical documents, data, or other information referenced in paragraph one hereof, and all hard drives, or other storage devices or media containing any such information, and all other SmartStream property" to Defendant's attorney. (TRO, at ¶ 2).

76. On May 10, 2017, Defendant swore under oath that he had not accessed the SmartStream Devices or any copies thereof since February 7, 2017. (Def. Aff. (ECF No. 26), ¶ 7). Defendant further swore that he no longer possessed any copies of SmartStream's "confidential information, trade secrets, and/or proprietary information." (*Id.* at ¶ 12).

77. Just nine days later, and in direct violation of the TRO, Defendant emailed a clearly marked SmartStream document to AxiomSL. (Dep. Ex. 15, at Axiom0000101; Def. Dep., 140:9-141:9). AxiomSL is not related to SmartStream in any way. (Kaddoura Dec. ¶ 25). In fact, both SmartStream and AxiomSL sell to the same customers and operate in the same regulatory reporting space. (Def. Dep., 143:23-144:24; Kaddoura Dec. ¶ 25).

78. On or around June 2017, AxiomSL retained Defendant to shape AxiomSL's "strategic initiative in managed services," including by developing a market engagement plan, building a

strategy and business plan, and executing the plan and timeline. (Dep. Ex. 15 at Axiom0000102-03). AxiomSL's representative specifically stated, "It's clear that AxiomSL can learn much from your experience running SmartStream." (*Id.*)

79. In furtherance of his work for AxiomSL, Defendant **again** violated this Court's TRO on June 29, 2017 by sending a clearly marked SmartStream document to AxiomSL. (Dep. Ex. 15 at Axiom0000017-18: "Here is what we built for DB;" Def. Dep., 136:3-25: Q: Who is "we"? A: SmartStream).

80. The attachment to the AxiomSL email, labeled "Deutsche Boerse Validate Trade – Smartstream.pptx," is a copy of a schematic arising from the SmartStream/ Deutsche Börse partnership, **identical** to the original schematic residing on the SmartStream MacBook. (*Compare* Dep. Ex. 5 with Dep. Ex. 15 at Axiom0000018; Def. Dep., 68:22-70:14; CFP Report, at 6; Kaddoura Dec. ¶ 24). The schematic is a "data flow" showing how SmartStream and Deutsche Börse will work together, how SmartStream works with customer data, and the outcome. (Def. Dep., 68:22-70:14).

81. AxiomSL compensated Defendant approximately ███████ for the services Defendant provided in June and July 2017. (*See* Dep. Ex. 14 at Chambadal00003-4; Def. Dep., 131:6-25).

**E.    On August 1, 2017, This Court Issues a Consent Order For Injunction, Which Defendant Violates.**

82. On July 28, 2017, SmartStream and Defendant jointly filed a proposed consent order for injunction, pursuant to which Defendant submitted an affidavit. (ECF No. 38; *see also* Affidavit of Defendant, at ECF No. 38-2 ("Def. Aff. II")).

83. Defendant swore through an affidavit dated July 22, 2017, in pertinent part:

a. He has not used any devices to back up the MacBook or to download any documents or data from the MacBook except for an external hard drive he left at SmartStream's office, and an upload of personal pictures. (Def. Aff. II, ¶ 3).

    i. This was a lie, as Defendant copied his SmartStream MacBook backup files (containing a wealth of SmartStream proprietary data) to an external device on February 4, 2017. (*See supra* ¶¶ 60-61 and *infra* ¶¶ 94-96).

b. He has not retained any devices that contain a backup or files copied from the MacBook other than a personal hard drive which contains only personal photos. (Def. Aff. II, ¶ 5).

    i. This was a lie, as Defendant retained the MacBook backup files on an external storage device until October 27, 2017. (*See infra* ¶¶ 93-95).

c. He has returned and has not retained any documents or data containing any SmartStream business, confidential, proprietary, or trade secret information. (Def. Aff. II, ¶ 11).

    i. This was a lie, as Defendant retained SmartStream documents on both an external storage device (until October 27, 2017), and his family's iMac (until November 9, 2017), in addition to documents contained within his personal email accounts. (*See infra* ¶¶ 93-99.)

d. Since January 5, 2017, he has not used or disclosed SmartStream's confidential or proprietary or trade secret information to anyone other than his attorney. (Def. Aff. II, ¶¶13-14).

    i. This was a lie, as Defendant emailed to external third parties SmartStream documents, including at least one presentation containing highly

confidential and trade secret financial information, on January 27, 2017.
(*See supra* ¶¶ 52-53, 77, and 79-80).

84. On August 1, 2017, this Court entered into a Consent Order For Injunction. (ECF No. 40, the "Injunction Order").

85. This Court specifically enjoined Defendant from possessing, disclosing, reviewing, actual or threatened use of, and/ or misappropriation of SmartStream's confidential information, trade secrets, documents and data. (*Id.* at ¶ 1).

86. This Court further ordered Defendant to return to SmartStream (within 20 days) all of SmartStream's confidential information and property, including any external hard drives or mirror images containing such information. (*Id.* at ¶ 2).

87. This Court further ordered Defendant to provide to CFP (within 20 business days) all of Defendant's computers, hard drives, storage devices, email accounts, tablets, and smartphones (among other things) for inspection to ensure they do not contain SmartStream's information. (*Id.* at ¶ 3).

88. Defendant violated the Injunction Order by failing to turn over his computers, storage devices, and other property to CFP within 20 business days of the Injunction Order. (CFP Report, at 3 (noting that CFP did not receive any devices from Defendant until October 27, 2017 and November 9, 2017)).

89. Defendant violated the Injunction Order by retaining possession of SmartStream's confidential information, trade secrets, documents and data. (*See infra* ¶¶ 93-99).

90. As a result of Defendant's then-known violations of the Injunction Order (i.e. failure to turn over any devices or documents to CFP), SmartStream sought an order of contempt and sanctions against Defendant. (*See* Letter to Judge Broderick Re: Request For Pre-Trial Motion

Conference to File Motion for Order to Show Cause Why Defendant Chambadal Should Not Be Held in Contempt of This Court's August 1, 2017 Consent Order For Injunction, at ECF No. 46).

91. After attending a contempt hearing before this Court, Defendant finally delivered two external storage devices to CFP on October 27, 2017. (CFP Report, 3). Defendant also provided account names and log-in information for his personal email accounts of pchambadal@gmail.com (the "Gmail Account") and Philip_98@yahoo.com (the "Yahoo Account"). (CFP Report, 6).

92. Defendant delivered his iMac desktop to CFP approximately two weeks later, on November 9, 2017. (*Id.*)

93. Of utmost concern, one storage device that Defendant provided to CFP on October 27, 2017—**nearly ten months after SmartStream first demanded that Defendant return all SmartStream documents and property**—was chalk-full of SmartStream's confidential and proprietary information. (CFP Report, 4-7).

94. For example, the storage device contained TimeMachine backups from the MacBook, in direct violation of the Injunction Order and in complete contravention of Defendant's July 22, 2017 affidavit testimony that he did not retain any MacBook backups. (CFP Report, 6-7; Def. Aff. II, ¶ 5).

95. The storage device contained SmartStream documents which Defendant himself admits include trade secret information. (CFP Report, 6-7). For example, the storage device contained the following documents disclosing the amounts charged by and/ or paid to SmartStream by client or customer, and pipelines for new deals: Dep. Ex. 2 at SmartStream00008 (service fees and project costs), Dep. Ex. 4 at SmartStream000003 (customer contract containing software fee and payment schedule), and Dep. Ex. 6[2] at SmartStream000095-97, 101-02, 104-106 (sales quotas by

---

[2] CFP inadvertently labeled Dep. Ex. 6 ("SmartStream000093 Finance Report_Apr 2016.v2.docx") as Dep. Ex. 7. The proper exhibit number is Dep. Ex. 6. (Walker Dec. ¶ 8).

SmartStream employees, SmartStream actual and expected revenues by client, contract value by customer, Company financial backlog by customer, and sales and deal pipelines). (CFP Report, 6-7; RFA Response, No. 33; Def. Dep., 100:11-101:3, 101:17-102:17; *see also* Kaddoura Dec. ¶¶ 9-10, 14-18).

96. Defendant violated the Agreement, lied under oath, and violated the Court's Injunction Order through his prolonged retention of SmartStream confidential and trade secret information on the storage device as well as disclosure of information to third parties. (*Id.*; *see also* Def. Aff. II, ¶¶ 3 and 11, Injunction Order, ¶ 1, and Cmpt., Ex. A at ¶ 3).

97. The iMac that Defendant provided to CFP on November 9, 2017 likewise contained SmartStream documents and confidential information that Defendant himself admits constitute trade secret information. (CFP Report, at 6; Dep. Ex. 4 at SmartStream000003 (customer contract containing software fee); *see also* Def. Dep., 100:16-101:3).

98. Defendant violated the Agreement, lied under oath, and violated the Court's Injunction Order through his prolonged retention of SmartStream confidential and trade secret information on his family's iMac as well. (*Id.*; *see also* Def. Aff. II, ¶ 11, Injunction Order at ¶ 1, and Cmpt., Ex. A at ¶ 3).

99. The Yahoo Account and Gmail Account also contained SmartStream documents and confidential information. (CFP Report, Appendix C). Of particular concern, the Yahoo Account contained an email sent by Defendant to an individual unrelated to SmartStream disclosing detailed, highly confidential slides showing SmartStream's total contract values identified by customer and client, and new SmartStream bookings identified by client and revenue. (*See supra* ¶¶ 52-53). Defendant violated the Agreement, lied under oath, and violated the Court's Injunction Order through his prolonged retention of SmartStream confidential and trade secret information in

the Yahoo Account as well.  (*Id.*; *see also* Def. Aff. II, ¶ 11, Injunction Order at ¶ 1, and Cmpt., Ex. A at ¶ 3).

**F.     SmartStream Is Damaged By Defendant's Unlawful Theft, Retention, Disclosure, and Use of SmartStream's Property and Proprietary Data.**

100. Defendant expressly acknowledged in the Agreement that "it may be difficult to measure any damages of the Company which might result from any breach by me of the obligations set forth in this Agreement, and that, money damages may be an inadequate remedy for any such breach. Accordingly, I agree that if I breach, or propose to breach, any portion of this Agreement, the Company shall be entitled, in addition to all other remedies that it may have, to a preliminary or permanent injunction or other appropriate equitable relief to restrain any such breach or proposed breach without showing or proving any actual damage to the Company." (Cmpt., Ex. A at ¶ 9).

101. Defendant further agreed to pay SmartStream for all costs and expenses, including attorneys' fees and expert fees "in any way connected with" his violation or non-performance of the Agreement.  (Cmpt., Ex. A at ¶ 9: "I agree to indemnify and hold harmless the Company from costs and expenses (including attorneys' and expert fees) damages, liabilities or obligations from any actions, suits, proceedings, claims, demands arising from, growing out of or in any way connected with the violation or non-performance by me of this Agreement.").

102. SmartStream retained the law firm Squire Patton Boggs to recover all SmartStream property, documents, and data stolen by Defendant, to enjoin Defendant's breaches of the Agreement and misappropriation of SmartStream's trade secrets, and to prevent future breaches of the Agreement and misappropriation of SmartStream's trade secrets.  (Kaddoura Dec. ¶ 31).

103. Attorneys' fees and costs arising from Defendant's violations of the Agreement amount to $ 339,601 to date. (Declaration of Meghan Hill ("Hill Dec."), at ¶ 8).

104. SmartStream also retained expert CFP to analyze the SmartStream property Defendant wrongfully withheld for nearly one year, and to purge from Defendant's personal devices and accounts SmartStream's confidential and proprietary information. (Kaddoura Dec. ¶ 32)

105. Expert fees arising from Defendant's violation of the Agreement amount to $ 12,135 to date. (Hill Dec. ¶ 11).

Respectfully submitted,

*/s/ Meghan E. Hill*
Meghan E. Hill (MH1523)
Jill S. Kirila (*pro hac vice*)
Kristine Woliver (*pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza, 23rd Floor
New York, New York 10112
Telephone: +1.212 872 9800
Facsimile: +1.212 872 9815
*meghan.hill@squirepb.com*
*jill.kirila@squirepb.com*
*kristine.woliver@squirepb.com*

*COUNSEL FOR PLAINTIFF*
*SMARTSTREAM TECHNOLOGIES, INC.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 15, 2019 I electronically filed the foregoing with the United States District Court for the Southern District of New York, which will notify the following parties:

Eric Robert Stern
Michael Mui
Sack & Sack, LLP
70 East 55th Street, 10th Fl.
New York, NY 10022
*ericstern110@gmail.com*
*mmui@sackandsack.com*

*Attorneys for Defendant*

*/s/ Meghan E. Hill*
One of the attorneys for Plaintiff
