UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
                                                     :
**SMARTSTREAM TECHNOLOGIES, INC.,**                  :
                                                     :          Case No. 1:17-cv-02459
                                Plaintiff,           :
                                                     :
                 - against –                         :
                                                     :          **DEFENDANT'S RESPONSE TO**
                                                     :          **REQUESTS FOR ADMISSION**
**PHILIPPE CHAMBADAL,**                              :
                                                     :
                                Defendant.           :
                                                     :
                                                     :
--------------------------------------------------------------------x

Defendant, Philippe Chambadal, hereby answers the First Set of Requests for Admission of Plaintiff, as follows:

1.      Admit that you used the MacBook Air computer (Serial No. SC02LN143F5V8)(the "MacBook") in the course of performing your employment duties for SmartStream.

**Response**:      Admit that Defendant used a MacBook Air laptop in the course of performing his employment duties for SmartStream but is unaware of its serial number.

2.      Admit that you used the Blackberry device (Device ID No. BB2C10910C), IMEI No. 35989052111213)(the "Blackberry") in the course of performing your employment duties for SmartStream.

**Response:**      Admit that Defendant used a Blackberry device in the course of performing his employment duties for SmartStream but is unaware of its Device Id. No. and/or IMEI No.

3.      Admit that you accessed SmartStream Confidential Information during the course

of your employment.

**Response:**    Admit.

4.    Admit that you accessed SmartStream Confidential Information when using the MacBook and the Blackberry during the course of your employment.

**Response:**    Admit.

5.    Admit that you signed the SmartStream Technologies, Inc. Employee Agreement Regarding Confidentiality and Non-Competition and proprietary Rights, dated July 21, 2015, attached hereto as Exhibit A.

**Response:**    Admit.

6.    Admit the Confidential Information you had access to through your employment with SmartStream was not generally known to others outside SmartStream.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement as to what "others" outside of SmartStream knew or didn't know concerning Confidential Information.

7.    Admit that SmartStream took measures to protect the secrecy of the Confidential Information you had access to through your employment with SmartStream.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

8.    Admit that Confidential Information you had access to through your employment with SmartStream was economically valuable to SmartStream.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

9.    Admit that during your employment with SmartStream you agreed to return all SmartStream property and information to SmartStream upon demand by the Company.

2

**Response:**   Admit.

10.   Admit that during your employment with SmartStream you agreed you would treat SmartStream information in a confidential manner and not use such information outside the scope of your SmartStream employment without prior written consent of SmartStream.

**Response:**   Admit.

11.   Admit that SmartStream requested return of its property by January 12, 2017 on or around January 5, 2017.

**Response:**   Admit.

12.   Admit that you failed to return all of SmartStream's property by January 12, 2017.

**Response**:   Admit.

13.   Admit that you failed to return all of SmartStream's property when SmartStream requested such return on January 9, 2017.

**Response:**   Defendant states that he did not return all of SmartStream's property on January 9, 2017 but is unaware as to the specific request alleged in this statement.

14.   Admit that you retained possession of the MacBook and the Blackberry until you turned these devices over to your legal counsel sometime between February 5, 2017 and February 16, 2017.

**Response:**   Admit that Plaintiff retained possession of the MacBook and the Blackberry until Plaintiff turned them over to legal counsel but does not recall the date the devices were given to legal counsel.

15.   Admit that, after January 12, 2017, you stated you would contact SmartStream's clients.

**Response:**  Plaintiff denies this statement as he never made such statement.

16.    Admit that, after January 12, 2017, you stated you would destroy SmartStream's pipeline.

**Response:**  Plaintiff denies this statement as he never made such statement.

17.    Admit that, after January 12, 2017, you stated you would issue letters to SmartStream's clients.

**Response:**  Plaintiff denies this statement as he never made such statement.

18.    Admit that, after January 12, 2017, you stated you would destroy SmartStream's market position.

**Response:**  Plaintiff denies this statement as he never made such statement.

19.    Admit that SmartStream did not give you permission to deliver the MacBook to your legal counsel.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

20.    Admit that, after January 12, 2017, while the MacBook was in your or your attorney's possession, files were deleted from the MacBook.

**Response:**    Admit in that Defendant deleted personal files on the MacBook.

21.    Admit that, after January 12, 2017, while the MacBook was in your or your attorney's possession, a complete backup of the MacBook to an external storage device was made using the TimeMachine backup program.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

22.    Admit that, after January 12, 2017, while the MacBook was in your or your attorney's possession, the MacBook was used in order to access a cloud storage site.

4

**Response:**    Admit.

23.    Admit that you backed up, saved to an external storage device, or copied documents from the MacBook after January 12, 2017.

**Response:**    Admit.

24.    Admit that you backed up, saved to an external storage device, or copied documents containing SmartStream Confidential Information from the MacBook after January 12, 2017.

**Response:**    Deny.

25.    Admit that you backed up content from the MacBook onto an external hard drive after January 12, 2017.

**Response:**    Admit.

26.    Admit that the content backed up onto an external hard drive from the MacBook after January 12, 2017 contained SmartStream Confidential Information.

**Response:**    Deny.

27.    Admit that you deleted SmartStream files from the MacBook after January 12, 2017.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

28.    Admit that the SmartStream files you deleted from the MacBook after January 12, 2017 contained SmartStream Confidential Information.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

29.    Admit that you visited a cloud storage site on the MacBook after January 12, 2017.

**Response:**    Admit.

30.    Admit that you uploaded or copied SmartStream files onto a cloud storage site after January 12, 2017.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

31.    Admit that you uploaded or copied SmartStream files onto Google Drive after January 12, 2017.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

32.    Admit that the files you uploaded or copied onto a cloud storage site (such as Google Drive) after January 12, 2017 contained SmartStream Confidential Information.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

33.    Admit that you were in possession of SmartStream's trade secrets after January 12, 2017.

**Response:**    Admit.

34.    Admit that SmartStream did not give you permission to retain its Confidential Information after January 12, 2017.

**Response:**    Admit that SmartStream demanded its Confidential Information back by January 12, 2017.

35.    Admit that SmartStream did not consent to the deleting of SmartStream Confidential Information or trade secrets on the MacBook after January 12, 2017.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

6

36.     Admit that SmartStream did not consent to the copying of SmartStream Confidential Information or trade secrets on the MacBook after January 12, 2017.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

37.     Admit that SmartStream did not give you permission to use its Confidential Information after January 12, 2017.

**Response:**    Admit.

38.     Admit that you have used SmartStream's Confidential Information since January 12, 2017.

**Response:**    Defendant denies this statement.

39.     Admit that you have disclosed SmartStream's Confidential Information since January 12, 2017.

**Response:**    Defendant denies this statement.

40.     Admit that you have copied SmartStream's Confidential Information since January 12, 2017.

**Response:**    Defendant states that he cannot truthfully admit or deny the accuracy of the statement.

41.     Admit that you have copied, used, deleted, or disclosed SmartStream's trade secrets and/or Confidential Information since January 12, 2017 with the intent to injure SmartStream's business.

**Response:**    Defendant denies this statement.

42.     Admit that your copying, deletion, use, and/or disclosure of SmartStream's Confidential Information since January 12, 2017 has caused SmartStream irreparable harm.

**Response:**    Defendant denies this statement.

7

43.     Admit that you violated the terms of the SmartStream Technologies, Inc. Employee Agreement Regarding Confidentiality and Non-Competition and Proprietary Rights, dated July 21, 2015, attached hereto as Exhibit A.

**Response:**     Defendant denies this statement.

44.     Admit that you received the letter from SmartStream dated January 5, 2017, attached hereto as Exhibit B.

**Response:**     Admit.

## **AFFIRMATION**

State of New York      }
                       } ss.:
County of New York  }

I, Philippe Chambadal, being duly sworn, depose and say that I have read, swear and affirm to

the contents above.

_____
PHILIPPE CHAMBADAL

Sworn to before me this 19th
day of October, 2018.

_____
NOTARY PUBLIC

MIGUEL MADERA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6381057
Qualified in New York County
My Commission Expires 09-24-2022

# EXHIBIT A

# SMARTSTREAM TECHNOLOGIES, INC.

### Employee Agreement Regarding
### Confidentiality and Non-Competition and Proprietary Rights

Name:  Philippe Chambadal

Current Address:  ██████████████████████████████

Social Security #:  ███████████████████

Passport #:  ███████████████████

Date:  7 / 2 / | 15

     I understand that during the course of my employment with SmartStream Technologies, Inc. ("Company"), I will have access to and may develop confidential information belonging to the Company or other parties. This Agreement applies to the entire duration of my employment with the Company; past, present and future and in accordance with the provisions hereof, is the entire agreement and understanding between myself and the Company regarding the subject matter hereof.

     This Agreement is entered into by me voluntarily and for good and valuable consideration (including my employment with the Company) the adequacy of which consideration I hereby acknowledge.

     Accordingly, I, the above-named Employee, intending to be legally bound, hereby agree with the Company as follows:

1.  Definitions:

    (a)   Proprietary Information. As used in this Agreement, "Proprietary Information" means non-public information (in all forms, including, digital, electronic, audio, visual, and paper based forms) which the Company possesses or has possessed from time to time, irrespective of whether the Company or another party (including any parent, subsidiary or affiliate of the Company worldwide) has any right, title or interest therein. Proprietary Information includes, by way of example and without limitation, trade secrets, ideas, designs, configurations, processes, techniques, formulas, software, improvements, inventions, data, know-how, copyrightable materials, patentable materials, trademarks/service marks, business and marketing plans and strategies, sales and financial reports and forecasts, and supplier lists, alliance partner lists and client lists. Proprietary Information also includes, without limitation, work and information developed by me in the course of my employment by the Company or otherwise relating to Inventions and Developments (as herein defined) which belong to the Company under Section 4 below.

    (b)   Inventions and Developments. As used in this Agreement, "Inventions and Developments" means any and all works, developments (including, without limitation, those relating to computer programming and/or software), know-how, inventions and ideas of any description whatsoever, whether or not patentable and/or copyrightable. Inventions and Developments include, by way of example

1

and without limitation, discoveries and improvements, which consist of or relate to any form of Proprietary Information.

       (c)   <u>Company-Related Inventions and Developments</u>.  For purposes of this Agreement, "Company-Related Inventions and Developments" means all Inventions and Developments which either: (a) relate at the time of conception or development to the actual or anticipated business of the Company or to its actual or anticipated research and development; (b) result from or relate to any work performed for the Company by any person or entity, whether or not during normal business hours; (c) are or were developed on Company time by any person or entity; or (d) are or were developed through the use of the Company's Proprietary Information or other facilities or resources by any person or entity.

    **2.**   <u>**Confidentiality.**</u>  **I understand and agree that my employment with the Company creates and has created a relationship of confidence and trust between me and the Company with respect to all Proprietary Information, including confidential information of others such as clients, alliance partners and suppliers with which the Company has a current or potential business relationship. At all times, both during my employment with the Company and after its termination, I will keep in confidence and trust all Proprietary Information, and will not use or disclose any such Proprietary Information without the prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties for the Company and as authorized by the Company. The restrictions set forth in this Section 2 will not apply to non-proprietary information which is generally known to the general public, unless such knowledge results from an unauthorized disclosure by me or a party other than Company.**

    3.   <u>Documents, Records, etc.</u>  All documents, records, apparatus, equipment and other intangible or tangible property (in all forms, including, digital, electronic, audio, visual, and paper based forms), whether or not pertaining to Proprietary Information, which are or have been furnished to me by the Company or are or have been produced by me in connection with or in furtherance of my employment with the Company are and will remain the sole property of the Company. I will return to the Company all such property as and when requested by the Company and keep no copies. In any event, I will return all such property immediately upon termination of my employment for any reason and I will keep no copies.

    4.   <u>Ownership.</u>  I agree that all Company-Related Inventions and Developments which I will or have conceived or developed, in whole or in part, either alone or jointly with others, during the term of my employment with the Company are and will be the sole property of the Company. The Company is and will be the sole owner of any and all right, title, interest, including all patents, copyrights and other proprietary rights, in and with respect to such Company-Related Inventions and Developments. To the fullest extent permitted by law, such Company-Related Inventions and Developments will be deemed works made for hire. I hereby irrevocably transfer and assign to the Company any and all right, title and interest, including, any and all proprietary rights which I may have or may acquire in any such Company-Related Inventions and Developments, and I waive any moral rights or other special rights which I may have or may accrue therein. At no charge to the Company, I agree to execute any and all documents and take any and all actions that may be required to effect and confirm the foregoing. The provisions of this Section 4 will apply to all Company-Related Inventions and Developments which are conceived or developed during the term of my employment with the Company, whether before or after the date of this Agreement, and whether or not further development or reduction to practice may take place after the termination of my employment, for which purpose it will be presumed that any Company-Related Inventions and Developments conceived by me which are reduced to practice within one (1) year after termination of my employment from the Company were conceived during the term of my employment with the Company unless I am able to establish a later conception date by clear and convincing evidence.

The provisions of this Section 4 will not apply, however, to any Inventions and Developments which may be disclosed in a separate Schedule 1 attached to this Agreement prior to its acceptance by the Company, as representing Inventions and Developments made by me prior to my employment by the Company.

5. <u>Disclosure of Inventions and Developments</u>. I agree promptly to disclose to the Company, or any persons designated by it, all Company-Related Inventions and Developments which are or may be subject to the provisions of Section 4.

6. <u>Obtaining and Enforcing Proprietary Rights</u>. I agree to assist the Company, at the Company's request, from time to time, and at no expense to the Company (except as set forth below), to obtain and enforce patents, copyrights, proprietary rights or other right, title or interest, with respect to Company-Related Inventions and Developments in any and all countries. I will execute all documents and instruments, deemed by Company to be reasonably necessary or appropriate for this purpose. This obligation will survive the termination of my employment with the Company in accordance with the provisions of this Agreement, <u>provided</u> that the Company will compensate me at a reasonable rate after such termination for time actually spent by me at the Company's request for such assistance. In the event that the Company is unable for any reason whatsoever to secure my signature to any document or instrument, deemed by Company to be reasonably necessary or appropriate for any of the foregoing purposes (including renewals, extensions, continuations, divisions or continuations in part), I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agents and attorneys-in-fact to act for me and on my behalf, for the purpose of executing and filing any such document or instrument and doing all other lawfully permitted acts to accomplish the foregoing purposes with the same legal force and effect as if executed by me.

7. <u>Third-Party Agreements and Rights</u>. I hereby confirm that I am not bound by the terms of any agreement or understanding with any previous employer or other party which restricts in any way my use or disclosure of information or my engagement in any business, except as may be disclosed in a separate Schedule 2 attached to this Agreement prior to its acceptance by the Company. I have delivered to the Company true and complete copies of any agreements listed on said Schedule 2. I represent to the Company that my execution of this Agreement, my employment with the Company and the performance of my duties for the Company will not violate any obligations I may have to any such previous employer or other party. In my work for the Company, I will not disclose or make use of any work or information in violation of any agreements with or rights of any such previous employer or other party, and I will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous employment or other party. Provided the Company complies with applicable laws, I authorize the Company, at any time, to directly or indirectly, procure information regarding my personal and business background, including but not limited to education, previous employment, credit and financial background, driving records and criminal convictions.

8. <u>Non-Competition</u>. In recognition of the good and valuable consideration to me arising from my employment with the Company and the necessity to preserve the business and goodwill of the Company, its parent, subsidiaries or affiliates (the "Smartstream Group"). I agree that if my employment with the Company is terminated for any reason, I will not, without the prior written consent of the Company, for a period of one (1) year after the date of such termination, directly or indirectly, on my behalf, on behalf of any other person (whether in an individual or representative capacity), or on behalf of any entity, engage in any business or activity in direct or indirect competition with the Smartstream Group, in the State of New York, in the State of New Jersey, and/or any other State or Country, in which the Smartstream Group is doing business as of the date of my termination of employment with the Company, which business or activity in direct or indirect competition with the Smartstream Group shall mean:

(i)     providing to any of the active clients of the Smartstream Group, as hereinafter defined, products or services similar to or competitive with the products or services available from the Smartstream Group during any part of the 1 year after the termination of my employment with the Company, or soliciting or attempting to solicit any active client of the Smartstream Group for the purpose of providing such products or services to it. For purposes hereof, active clients shall mean those persons or entities for which the Smartstream Group was in contract, sold or leased any product, or performed any service during the 1 year period immediately preceding the termination of my employment with the Company, including but not limited to such persons or entities that I had direct or indirect contact with during the course of my employment with the Company; and/or

(ii)    directly or indirectly contacting, or providing products or services similar to or competitive with the products or services available from the Smartstream Group during any part of the one (1) year after the termination of my employment, to any past or prospective client of the Smartstream Group during the 1 year period immediately prior to the effective date of the termination of my employment with the Company, including but not limited to such persons or entities that I had direct or indirect contact with during the course of my employment with the Company, regardless or whether such past or prospective clients are or were "active" at any time as defined above. For purposes hereof, prospective clients shall mean those persons or entities to whom any member of the Smartstream Group has submitted a proposal intending to create a contract during the one (1) year period immediately preceding the termination of my employment with the Company. For purposes hereof, past clients shall mean those persons or entities to whom any member of the Smartstream Group had contracted with, sold or leased any product, or performed any service during the one (1) year period immediately preceding the termination of my employment with the Company; and/or

(iii)   hire, subcontract, employ or engage, or solicit, contact or communicate with for the purpose of hiring, employing, subcontracting or engaging, any person or entity which was a current or prospective employee, supplier or subcontractor of the Smartstream Group, at the time of the termination of my employment with the Company or at any time within the 1 year period immediately preceding such termination, for the purpose of performing the same or similar services that such person was performing for the Smartstream Group during any part of the 1 year after the termination of my employment with the Company; and/or

(iv)    For a period of one (1) year immediately following the termination of my employment, I shall not directly or indirectly work for any of the Smartstream Group's clients, to whom the Smartstream Group during the period of twelve (12) months preceding the termination of my employment with the Company provided professional services or support services to; and/or

(v)     For a period of one (1) year immediately following the termination of my employment, I shall not directly or indirectly work for any companies in competition with the SmartStream Group. For the purpose of this clause, competitors include but are not limited to ADP Wilco, Asset Control, Broadridge, Broadridge City Networks, CorFS, China Systems, CSI, Fiserv, Golden Source, Gresham Computing, Information Mosaic, Misys, Netik, Pacemetrics, Pegasystems, Paladyne, Sungard, Surecomp, Swallow, Vermeg and XSP.

The Company and I agree that the period of time and geographical area and general scope of this provision are reasonable in view of the nature of the business in which the Company is engaged, my knowledge of its business and the unique nature of my involvement in the Company's business. However, if any of such

periods or such area should be judged unreasonable in any judicial proceedings, then such period of time or geographical area or general scope shall be reduced by elimination of such portion thereof, so that this covenant may be enforced in such area and during such period of time as is adjudged to be reasonable.

Without limiting the generality of Section 9 herein, the parties recognize that a remedy at law for a breach of this Section 8 may not be adequate, and for its protection, the Company shall have the right to obtain, in addition to any other relief and remedies available to it, injunctive relief, whether mandatory or restraining, to enforce the provisions of this Section 8.

The Company agrees that subsections 8(i), (ii), (iv) and (v) shall apply only in the event that I terminate my employment with the Company for any reason or no reason or if I am discharged by the Company from my employment with the Company for good cause.

9.      Injunction & Damages.  I agree that it may be difficult to measure any damages of the Company which might result from any breach by me of the obligations set forth in this Agreement, and that, money damages may be an inadequate remedy for any such breach.  Accordingly, I agree that if I breach, or propose to breach, any portion of this Agreement, the Company shall be entitled, in addition to all other remedies that it may have, to a preliminary or permanent injunction or other appropriate equitable relief to restrain any such breach or proposed breach without showing or proving any actual damage to the Company. In the event that the provisions of Section 8 are violated by me and the Company obtains a preliminary or permanent injunction, the duration of the limitations in favor of the Company shall be extended to 1 year from the effective date of such injunction, less any period between the termination of my employment with the Company and the effective date of such injunction during which I prove that I was not in violation of the provisions of this Agreement, it being the intention of the parties to ensure that the Company shall enjoy one full year of actual freedom from competition from me. Furthermore, I agree to indemnify and hold harmless the Company from costs and expenses (including attorneys' and expert fees) damages, liabilities or obligations from any actions, suits, proceedings, claims, demands arising from, growing out of or in any way connected with the violation or non-performance by me of this Agreement.

10.      Binding Effect.  This Agreement will be binding upon me and my heirs, executors, administrators and legal representatives and will inure to the benefit of the Company. For purposes hereof, the Company includes any parent, subsidiary or affiliate of the Company worldwide, and any successors or assigns of any such entity.

11.      Enforceability.  If any portion or provision of this Agreement is to any extent declared invalid, illegal or unenforceable by a court or tribunal of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared invalid, illegal or unenforceable, will not be affected thereby, and each portion and provision of this Agreement shall be valid, legal and enforceable to the fullest extent permitted by law and a commercially reasonably construction shall be given to the invalid, illegal or unenforceable provision so as to best reflect the intent of the parties as set forth in this Agreement. In the event that any provision of this Agreement is determined by any court or tribunal of competent jurisdiction to be excessive in scope as to geographic, temporal or functional coverage, such provision will be deemed to extend only over the maximum geographic, temporal and functional scope as to which it may be enforceable. At no charge to the Company, I agree to fully cooperate with the Company and to execute and deliver such instruments, documents and agreements and to give such further written assurances, as may be requested by the Company to better evidence and to carry into effect the intent and purpose of this Agreement.

12.     <u>Notices & Service of Process</u>.  Any notices, requests, demands and other communications provided for by this Agreement will be sufficient if in writing and (i) delivered in person or (ii) sent by prepaid national or international courier, to me at the last address which I have on file with the Company or, in the case of any notice to the Company, at its main offices, to the attention of its President.  I agree to accept by any service of process of any legal documents, in addition to any means provided by applicable law, by the means set forth in (i) and (ii) above and I hereby waive any right I may have to object to such service of process by such means.

13.     <u>Arbitration</u>.  Any dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled by arbitration, before one arbitrator in accordance with the rules of the American Arbitration Association then in effect and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.  The arbitrator will be selected, by the parties, from a panel of attorney arbitrators experienced with the computer industry.  The parties agree that any arbitration shall be held in New York, New York.  The language of the arbitration shall be in English.  The arbitrator will have no authority to make any relief, finding or award that does not conform to the terms and conditions of this Agreement.  Each party shall bear its own attorneys' or expert fees and any and all other party specific costs, except as otherwise expressly provided for by this Agreement or limited by applicable law.  Either party, before or during any arbitration, may apply to a court having jurisdiction for a restraining order or injunction where such relief is necessary to protect its interests.   Prior to initiation of arbitration, the aggrieved party will give the other party written notice, in accordance with this Agreement, describing the claim as to which it intends to initiate arbitration.

14.     <u>Governing Law & Forum</u>.  This Agreement shall be construed under and be governed in all respects by the laws of the State of New York without regard to its conflicts of laws principles. Without limiting the applicability of the arbitration clause hereof, the parties consent to the jurisdiction of the state or federal courts having jurisdiction over matters arising in New York County, State of New York.  In any such proceeding, each party shall waive, if applicable, any right to a jury.

15.     <u>General</u>. This Agreement may not be amended, modified or waived except by a written instrument duly executed by the person against whom enforcement of such amendment, modification or waiver is sought.  The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, in any particular case will not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any separate or subsequent breach.  The obligations and liabilities imposed upon me by this Agreement will survive the termination of my employment with the Company. The headings and labels set forth in this Agreement are for convenience only.  This Agreement may be executed in one or multiple original counterparts each of which shall be deemed an original for all purposes.  A facsimile or electronic signature shall be deemed an original signature for purposes of this Agreement.

16.     <u>Employment At Will - No Contract of Employment</u>.  Nothing in this Agreement shall be construed as a contract of employment between myself and the Company or as a commitment on the part of the Company to retain me in the employ of the Company, in  any capacity, for any period of time or at a certain benefit or compensation level. Nothing in this Agreement shall alter my status with the Company as an Employee-At-Will.

17.     <u>Entire  Agreement</u>.   This  Agreement  constitutes  the  entire  agreement  between  the Company and myself with respect to the subject matter hereof, and supersedes all prior understandings and agreements with respect to such subject matter.

18.     I shall, if required, comply with and sign up for all client policies and regulations including without limitation policies regarding confidentiality, security compliance, standards of behavior or dress code, as any of the Company's clients to whom I am assigned may request when I am undertaking work on behalf of that client. I agree to comply with any vetting procedures/policies requested by any such of the Company's clients and agrees to provide all necessary information and documentation when requested.  Failure to comply with the foregoing may be considered as misconduct on my part.

**I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS.  I HAVE READ IT CAREFULLY AND I AM SATISFIED THAT I UNDERSTAND IT COMPLETELY. I ACKNOWLEDGE THAT I HAVE HAD THE OPPORTUNITY TO SEEK INDEPENDENT LEGAL ADVICE AS TO MY EXECUTION OF THIS AGREEMENT.**

[EXECUTION PAGE FOLLOWS]

Philippe Chambadal

SMARTSTREAM TECHNOLOGIES, INC.

By:

Mercedes Rendon
SVP - SmartStream

SCHEDULE 1

PRIOR INVENTIONS AND DEVELOPMENTS

I UNDERSTAND THAT THIS SCHEDULE 1 TO MY EMPLOYEE AGREEMENT REGARDING CONFIDENTIALITY, NON-COMPETITION AND PROPRIETARY RIGHTS AFFECTS IMPORTANT RIGHTS. I HAVE READ THE AGREEMENT CAREFULLY AND I AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.

NONE.

_____
Philippe Chambadal

SMARTSTREAM TECHNOLOGIES, INC.

By: _____
Mercedes Rendon
SVP - SmartStream

SCHEDULE 2

PRIOR AGREEMENTS

I UNDERSTAND THAT THIS SCHEDULE 2 TO MY EMPLOYEE AGREEMENT REGARDING CONFIDENTIALITY, NON-COMPETITION AND PROPRIETARY RIGHTS AFFECTS IMPORTANT RIGHTS. I HAVE READ THE AGREEMENT CAREFULLY AND I AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.

NONE.

_____
Philippe Chambadal

SMARTSTREAM TECHNOLOGIES, INC.

By: _____
Mercedes Rendon
SVP - SmartStream

9

# EXHIBIT B



**SmartStream**

SmartStream Technologies
1 Broadway, 2nd Floor
New York, NY 10004
USA

www.smartstream-stp.com

T: +1 212 763 6500

**BY HAND**

January 5, 2017

Philippe Chambadal,
151 West 17th Street,
Apt 5D,
New York,
NY 10011

Dear Philippe,

This confirms our notice to you during our meeting today that SmartStream Technologies, Inc. (the "Company") has decided to terminate your employment with the Company, effective April 4, 2017 (the "Separation Date") for the reasons we discussed during our meeting today. Your performance of your duties and responsibilities to the Company has failed to meet the Company's reasonable expectations.

To ensure that there are no ambiguities, this letter explains in detail both your rights and obligations and those of the Company upon termination of your employment. Your employment with the Company terminates as of and effective on the Separation Date. Thereafter, you will no longer be an employee of the Company. You will be paid all earned and unpaid salary, less withholdings and deductions required or permitted by law, in your final paycheck.

Your coverage under the Company's group health plan will end on April 30, 2017. You will have the opportunity to exercise your option to continue your group health plan coverage under COBRA after that date. Under separate cover, you will be provided a benefits packet containing information on your COBRA rights and conversion to a direct pay plan. Your coverage under the Company's other employee benefits plans will end on the Separation Date.

During the period between today and the Separation Date, you will be on "Garden Leave." The following terms and conditions of employment will apply for the duration of your Garden Leave:

a. You are not required to carry out your normal duties; you are to carry out only such duties as the Company may specifically request which include providing your assistance and cooperation in transitioning your duties to the Company's specified designee.

Registered Office
SmartStream Technologies
1 Broadway, 2nd Floor
New York, NY 10004
USA

b.  You should not attend work (or engage in any other activity) at any of the Company's premises unless specifically requested by the Company; nor should you have any business dealings or contact with clients or customers of the Company or other group companies.

c.  You should not have any contact with other employees of the Company or other Group companies except for purely social or recreational purposes and you should not discuss clients or customers or their affairs with any employee unless specifically authorized to do so.

d.  You should not work in any capacity for any other person, company, organization or other entity or carry on any other business in competition with the Company and other Group companies.

e.  You are not to transact any business on behalf of the Company and if you are contacted by clients or customers you should refer them to the Company.

During your Garden Leave, your employment with the Company remains on an at will basis. Accordingly, at any time before the Separation Date, either you or the Company may terminate your employment with the Company for any reason or for no reason upon written notice to the other.

In accordance with your Offer Letter with the Company dated June 22, 2011, you are required to return any and all Company property at home or elsewhere within one (1) week of the date of this letter, *i.e.*, no later than January 12, 2017. Additionally, please keep the Company informed of any address changes in case we need to mail future W-2's and other correspondences to your attention.

We also remind you of your continuing obligations set forth in the Employee Agreement Regarding Confidentiality and Non-Competition and Proprietary Rights between you and the Company dated July 21, 2015 (the "Confidentiality Agreement") which remain in full force and effect.

In addition to the foregoing to which you are eligible, the Company is prepared to offer you additional benefits to which you are otherwise not eligible, as follows:  (a) severance in the gross amount of $167,187.50, which amount is equal to three (3) months of your base salary, less all applicable tax withholdings, including federal, state and local income tax, FICA and FUTA, in a lump sum on the Company's first regularly scheduled payroll date following the "Re-Execution Effective Date" (defined in Section 15.1 of the attached Separation Agreement and General Release ("Agreement"); and (b) the Company's agreement to characterize your separation from the Company as a voluntary resignation rather than an involuntary termination ((a) and (b), collectively, the "Separation Benefits"), in exchange for your agreement to release all claims known or unknown against the Company (and related individuals and entities), as well as the other agreements and understandings set forth in this letter and the attached Agreement.

If you wish to accept such Separation Benefits in consideration for the Agreement, your notarized signature on the enclosed Agreement will reflect your agreement.  You may

Registered Office
SmartStream Technologies
1 Broadway, 2nd Floor
New York, NY 10004
USA

take up to twenty-one (21) days from your receipt of this letter if you wish, to consider whether to accept the Separation Benefits by signing and delivering the Agreement to the Company.  Before signing the Agreement, you are advised to consult an attorney, if you wish.  Please note that even if you do sign the Agreement, you may change your mind and revoke the Agreement and forego all of the Separation Benefits described therein, provided you notify me in writing within seven (7) days of your executing the Agreement that you no longer want those Separation Benefits.  If you want to revoke the General Release, you must do so in writing, addressed to and received by me at SmartStream Technologies, Inc., 1 Broadway, Second Floor, New York, NY, 10004, by hand or by facsimile at (646) 219-4967, by 5:00 p.m. EST on the seventh (7th) day following your execution and delivery to the Company of the enclosed Agreement. Please also note that, to be eligible to receive the Separation Benefits, you are required to re-execute the Agreement before a notary public and delivering it to the Company (and not revoke your re-execution within seven (7) days thereof) on your last date of employment with the Company.

Please do not hesitate to contact me on +44 (0) 207 898 0608 if you have any questions.


Sincerely,

David Porter
Human Resources Director

Registered Office
SmartStream Technologies
1 Broadway, 2nd Floor
New York, NY 10004
USA