UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                             :

SMARTSTREAM TECHNOLOGIES, INC.,   :

                       Plaintiff,    :

                             :

            - against -        :

                             :

PHILIPPE CHAMBADAL,                  :

                             :

                    Defendant.   :

                             :

-----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _9/30/2019_

17-CV-2459 (VSB)

**REDACTED**
**OPINION & ORDER**

Appearances:

Jill S. Kirila
Kristine Woliver
Meghan E. Hill
Squire Patton Boggs (US) LLP
Columbus, OH
*Counsel for Plaintiff*

Eric R. Stern
Jonathan S. Sack
Sack and Sack, LLP
New York, NY
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

       SmartStream SmartStream Technologies, Inc. ("SmartStream") brings this action against

Defendant Philippe Chambadal ("Chambadal"), alleging breach of contract, New York trade

secret misappropriation, and violation of the Defend Trade Secrets Act of 2016, ("DTSA"), 18

U.S.C. § 1831, *et seq.*  Before me is SmartStream's motion for summary judgment on all three of

its claims and its request for attorneys' fees, and its motion to strike Documents 78-1 and 82

from the record.  For the reasons stated herein, SmartStream's motion to strike is GRANTED IN

PART AND DENIED IN PART, and SmartStream's motion for summary judgment is
GRANTED IN PART AND DENIED IN PART.

I.    **Background**[1]

Smartstream is a financial technology company that provides data and software solutions
to banks and other similar customers.  (Def.'s Resp. 56.1 ¶ 1.)[2]  Chambadal became a member of
SmartStream's Board of Directors in 2007.  (*Id.* ¶¶ 2, 3.)  He subsequently became the Chief
Executive Officer ("CEO") of SmartStream in 2011 and continued to serve on the Board of
Directors.  (*Id.* ¶ 4.)  The terms and conditions of Chambadal's employment as CEO were
outlined in an Offer Letter dated June 22, 2011.  (*Id.* ¶ 7.)

Several years later, on July 21, 2015, the parties entered into the Employee Agreement
Regarding Confidential and Non-Competition and Proprietary Rights (the "Employee
Agreement").  (*Id.* ¶ 9.)  Under the Employee Agreement, SmartStream agreed to employ
Chambadal on an at-will basis and provide him with access to proprietary and confidential
information and other SmartStream property.  (*Id.*; Emp. Agmt. 1.)[3]  In turn, Chambadal
assumed certain obligations with respect to that information and property, including (1) to keep

---

[1] Unless otherwise indicated the facts contained in this section are undisputed.

[2] "Def.'s Resp. 56.1" refers to Defendant's Response to Plaintiff's Rule 56.1 Statement of Undisputed Facts (Doc. 79), which, in compliance with Rule 4(F) of my Individual Rules & Practices in Civil Cases aggregates the entries in Plaintiff's 56.1 Statement ("Pl.'s 56.1"), (Doc. 70), with Defendant's responses to each one.  Citations and references to individual paragraphs of Defendant's Response therefore refer to Plaintiff's statements, Defendant's responses, or some combination thereof.  Plaintiff's statement and Defendant's response both contain redactions.

Accordingly, because this Opinion & Order refers to materials that were redacted and/or filed under seal, it will be initially filed under seal and not on the public docket.  I am sending a copy of the Opinion & Order to the parties, and concurrently entering an order directing the parties to submit a joint letter indicating any redactions they propose and the rationale for those redactions.  I will then review the proposed redactions, determine if they are appropriate, and file the redacted version of the Opinion & Order on the public docket.

[3] "Emp. Agmt." refers to the Employee Agreement Regarding Confidentiality and Non-Competition and Proprietary Rights, (Doc. 70-1, at 11–19), filed on April 5, 2017 as Exhibit 2 to Defendant's Response to Plaintiff's Request for Admissions, ("Def.'s Resp. RFA"); the RFA responses are themselves attached as Exhibit A to Plaintiff's Rule 56.1 Statement, filed February 15, 2019, (Doc. 70).

information defined as "Proprietary Information" in "trust and confidence," (Emp. Agm. ¶¶ 1(a), 2); (2) to return SmartStream's property to SmartStream "as and when requested" or "immediately upon termination" and to "keep no copies," (*id.* ¶ 3); and (3) to indemnify SmartStream for costs and expenses relating to his violation or non-performance of the Agreement, (*id.* ¶ 9).

As CEO, Chambadal had wide-ranging duties that included explaining SmartStream's services to customers, pitching SmartStream's services to potential clients, preparing business strategies on behalf of SmartStream and communicating them to the management team, discussing competitive positioning and presenting about that to the Board of Directors, and preparing sales plans, addressing which segments of the market SmartStream would target and how.  (Def.'s Resp. 56.1 ¶ 20.)  To facilitate Chambadal's ability to carry out his duties, SmartStream issued him a MacBook laptop computer and a Blackberry.  Chambadal traveled frequently and used these devices to work remotely.  (*Id.* ¶¶ 21–23.)  He saved SmartStream documents locally to the MacBook, and used an external storage hard drive to back these files up approximately once a month.  (*Id.* ¶ 24.)  Chambadal also used his family's personal desktop computer, an iMac, to access and send SmartStream documents, including, for example, by scanning a signed contract to the computer and then e-mailing it from his personal Gmail account to his SmartStream email account.  (*Id.* ¶ 25.)

Chambadal served as SmartStream's CEO until around spring 2016, when he transitioned within the company into a non-executive business development role.  (*Id.*.)  However, on January 5, 2017, SmartStream informed Chambadal orally and by written notice that his employment was being terminated, effective April 4, 2017, the "separation date."  (*Id.* ¶ 42; Term. Not. 1.)[4]

---

[4] "Term. Not." or "Termination Notice" refers to a letter from SmartStream dated January 5, 2017 informing Chambadal of the termination of his employment, (Doc 70-1, at 21–23), filed on February 15, 2019, as Exhibit B to

Until that final separation date, Chambadal was placed on a "garden leave," during which he continued to receive his salary and health insurance coverage, but was prohibited from performing any employment duties, from engaging in any dealings or contact with SmartStream's clients or customers, and from working in any capacity for any other person, company, or entity.  (Def.'s Resp. 56.1 ¶¶ 42–44; Term. Not. 1–2.)  The notice instructed Chambadal that he was "required to return any and all Company property at home or elsewhere within one week of the date of this letter . . . January 12, 2017."  (Def.'s Resp. 56.1 ¶ 44; Term. Not. 2.)

SmartStream followed up on this request on January 9, 2017 by e-mailing Chambadal informing him that it would have his "mobile phone number transferred" once he returned his "IT equipment, passwords and building passes."  (Def.'s Resp. 56.1 ¶ 45; Def.'s Dep. 121:6-21; Dep. Ex. 12).[5]  Chambadal e-mailed back that day indicating that he would drop "the equipment" off the next day.  (Def.'s Resp. 56.1 ¶ 46; Def.'s Dep., 121:6-21; Dep. Ex. 12).  The next day, however, Chambadal e-mailed SmartStream indicating he would not be able to drop the equipment off that day because he had to "leave town."  (Def.'s Resp. 56.1 ¶ 46; Def.'s Dep., 122:13-25, 123:1-9; Dep. Ex. 13.)  On January 17, 2017, SmartStream again requested that Chambadal return the company's property.  (Def.'s Resp. 56.1 ¶ 50.)

Chambadal did not return the property.  However, he contends that by January 27, 2019, he had "commenced efforts [through his counsel] to secure the return of SmartStream's

---

Defendant's Response to Plaintiff's Request for Admissions, (Doc. 70-1).  The responses to the request for admission are attached as Exhibit A to Plaintiff's Rule 56.1 Statement.  (Doc. 70.)

[5] "Def.'s Dep." refers to the transcript of Defendant's deposition, dated October 29, 2018. Excerpts of this transcript were filed on April 5, 2017, as Exhibit C, (Doc. 70-3), to the Hill Declaration, (Doc. 70); the full transcript was filed on April 12, 2019 as Exhibit B to the April 12, 2019 Declaration of Jonathan Sack in opposition to Plaintiff's motion for summary judgment ("Sack Declaration"), (Doc. 78).  "Dep. Ex." refers to the specified exhibit to Defendant's deposition, filed on February 15, 2019, as Exhibits 3 through 13 to Plaintiff's Rule 56.1 Statement.  (Doc. 70.)

property," and by February 7, 2017, he had given the MacBook and BlackBerry to his counsel. (*Id.* ¶ 46.)

In any event, during the first few days of February 2017, SmartStream's attorneys and Chambadal's attorney, Jonathan Sack, corresponded by e-mail, with SmartStream's counsel requesting that Chambadal return the "company property" and Sack asserting that he would take custody of the property and would arrange to have a "mirror image" made of any "storage devices." (*Id.* ¶¶ 46–47, 55–56, 58–59; Compl. Exs. C, D.)[6] SmartStream's counsel responded that Chambadal was "required to return any and all property and documents, and not retain any copies," and that SmartStream did not consent to Sack's retention of the MacBook and the Blackberry or the making of any mirror images. (Def.'s Resp. 56.1 ¶ 58; Compl. Ex. D, at 12.) SmartStream's counsel also informed Sack that SmartStream had retained a third-party vendor, the Consumer Forensics Practice, LLC ("CFP"), to retrieve the MacBook, Blackberry, and any other company property by February 7, 2017 at 9:30 a.m., or at an alternative time to be arranged by Sack and CFP. (Def.'s Resp. 56.1 ¶ 59; Compl. Ex. D, at 12.)

When Lacey Walker of CFP appeared at Sack's offices at the appointed time on February 7, he was informed that Sack would not release the devices. (Def.'s Resp. 56.1 ¶ 64.) SmartStream's counsel e-mailed Sack again on February 8, 2017, demanding that Chambadal return the laptop and Blackberry without taking any images of them by the following morning. (*Id.* ¶ 65; Compl. Ex. D, at 9.)

Chambadal apparently did not do so. On February 10, 2017, a "mirror image" of the MacBook—a copy of its entire contents—was made. (Def.'s Resp. 56.1 ¶ 66.) Chambadal

---

[6] "Compl." refers to Defendant's Complaint, filed on April 5, 2017. (Doc. 1.) "Compl. Ex." refers to the specified lettered exhibit to the Complaint, when also cited in Plaintiff's 56.1 Statement. Defendant does not dispute the authenticity of the cited exhibits and directs the Court's attention to them in his responses. (*See, e.g.*, Def.'s Resp. 56.1 ¶¶ 50, 55–59.)

asserts that a third-party company created this mirror image and saved it to an external hard drive ("Mirror Image"), which Sack avers he immediately placed in a locked cabinet in his office. (Sack Affirm. Opp. PI ¶ 21.)[7]

On February 13, 2017, SmartStream filed a replevin action in the Supreme Court of the State of New York to obtain return of the devices. (Def.'s Resp. 56.1 ¶ 68.) On February 16, 2017, Sack turned over the MacBook and the Blackberry to CFP. (*Id.* ¶ 69.)[8]

Between January 5, 2017 and February 13, 2017, Chambadal used the MacBook, copied, and transmitted SmartStream documents on several occasions, including the following:

- On January 27, 2017, Chambadal sent an e-mail from a personal e-mail account to an outside individual not employed by or affiliated with SmartStream. (*Id.* ¶ 42.) This e-mail contained an attachment titled "STL Corporate Q4 2016.pptx," which was a PowerPoint slide presentation whose title slide and slide headers read "SmartStream." (*Id.*)

- On February 4, 2017, an external storage device was plugged into the MacBook and certain data was backed up. (*Id.* ¶ 60.) Chambadal admits that he plugged in an external storage device but states his intent was only to extract personal photographs. (*See id.*; Def.'s Aff. ¶ 9; Def.'s Dep. 127:15-128:8.)[9]

SmartStream then filed this action along with a proposed Order to Show Cause for a temporary restraining order and preliminary injunction, which I issued on April 13, 2017. (*See*

---

[7] "Sack Affirm. Opp. PI" refers to the Affirmation of Jonathan Sack in Opposition to the Issuance of a Temporary Restraining Order and Preliminary Injunction, originally filed on May 10, 2017. (Doc. 24.) This affirmation was also filed on April 12, 2019 as Exhibit E, (Doc. 78-5), to the Sack Declaration, (Doc. 78).

[8] Lacey Walker, Jr., eventually prepared a Computer Forensics Expert Report ("CFP Report") for use in connection with this litigation, which was filed on February 15, 2019, as Exhibit B, (Doc. 70-2), to SmartStream's Rule 56.1 Statement, (Doc. 70). In it, he states that he conducted a forensic analysis of the MacBook but that he could not analyze the Blackberry, and further presents his findings as to the MacBook.

This report was not sworn to under penalty of perjury. (*See* CFP Report.) Walker also submitted a sworn Declaration ("Walker Decl."), dated February 14, 2019, and filed on April 12, 2019. (Doc. 73.) This Declaration reports additional forensic findings, but does not contain any averments as to the truth of the CFP Report. However, the relevant findings are set forth in Plaintiff's 56.1 Statement and admitted by Chambadal as indicated here. Therefore, it is not the source of any material disputed factual assertion, and despite the potential deficiencies in the CFP Report, I do not and need not reach any conclusion as to its admissibility to decide the instant motion.

[9] "Def.'s Aff." refers to the Affidavit of Philippe [*sic*] Chambadal, filed on May 10, 2019. (Doc. 82.) As explained *infra*, I decline to strike this Affidavit.

TRO.)[10]   The TRO, *inter alia*, restrained Chambadal from accessing or using any SmartStream confidential information and from "transferring, copying, altering, deleting, or otherwise disturbing the status of any such data or documents . . . from any computers, hard drives, email, cloud accounts or other storage locations or media."  (TRO at 2, ¶ 2.)  He was also ordered to turn over all SmartStream property to his legal counsel.  (*Id.* at 2.)

On May 10, 2017, Chambadal submitted his papers in opposition to SmartStream's motion for a preliminary injunction, which included an affidavit in which he swore that he did "not possess any additional copies of SmartStream's confidential information, trade secrets, and/or proprietary information on any of my personal computers, cell phones, or any other electronic devices."  (Def.'s Aff. Opp. PI ¶ 7).[11]   On May 17, 2019, I held a hearing on the motion for preliminary injunction and directed the parties to propose a consent order for an injunction and to ensure the Mirror Image was sealed and placed with CFP.[12]

On May 19, 2017, Chambadal emailed a document entitled "SmartStream corporate overview.pdf" to a person named Alex Tsigutkin, an employee of a company called AxiomSL ("Axiom").  (Def.'s Resp. 56.1 ¶ 77).  Then, in June 2017, AxiomSL retained Chambadal's services.  (*Id.* ¶ 78).  On June 29, 2017, Chambadal sent a document called ██████████ Validate Trade – Smartstream.pptx" to Tsigutkin and another person at Axiom named Helen Rosen.  (*Id.* ¶ 79.)

---

[10] "TRO" refers to my Order to Show Cause for Preliminary Injunction and Temporary Restraining Order, issued on April 13, 2019.  (Doc. 16.)

[11] "Def.'s Aff. Opp. PI" refers to Defendant's Affidavit in Opposition to the Issuance of a Temporary Restraining Order and Preliminary Injunction, filed on May 10, 2017.  (Doc. 26.)

[12] The parties do not address the fate of the Mirror Image in their submissions, but SmartStream does not assert that Chambadal failed to comply with this directive.

I issued the parties' proposed injunction on August 1, 2017 (the "Injunction"). Within twenty (20) days of the Injunction, SmartStream was to return all of SmartStream's confidential information and property in his or his agents' possession; produce all computers, external hard drives or other storage devices, tablets, smartphones, personal email accounts for inspection; and to provide full access to all his email accounts or internet-based cloud drives. (Inj. 1–2)[13] Along with the proposed injunction, Chambadal filed another affidavit, in which he swore he had not retained any documents or data containing any "SmartStream business, confidential or proprietary information or trade secrets." (Def.'s July 2017 Aff. ¶ 11.)[14]

Chambadal did not turn over his personal devices within the time specified by the Injunction. (Def.'s Resp. 56.1 ¶ 88.) On October 3, 2017, upon SmartStream's request, I issued an Order to Show Cause why Chambadal should not be held in contempt for failing to comply with the terms of the Injunction. (Contempt OSC 1.)[15] Chambadal's counsel opposed, arguing that Chambadal had been attempting in good faith to coordinate the return of the devices. (Sack Ltr. Opp. Cont. 1–2.)[16] I held a hearing on October 12, 2017, at which I directed the parties to meet and confer regarding the matters discussed.

On October 27, 2017, Chambadal delivered two additional external storage devices to CFP, along with log-in information for two personal email accounts. (Def.'s Resp. 56.1 ¶ 91.) He delivered his personal iMac desktop computer (the "iMac") to CFP on November 9, 2017.

---

[13] "Inj." refers to the Consent Order for Injunction, issued on August 1, 2017. (Doc. 40.)

[14] "Def.'s Inj. Aff." refers to the Affidavit of Philippe Chambadal that was filed along with the parties' proposed order for injunction on July 28, 2017. (Doc. 38-2). The same affidavit was also filed on April 12, 2019, as Exhibit E, (Doc. 78-5), to the Sack Declaration in opposition to Plaintiff's motion for summary judgment, (Doc. 78).

[15] "Contempt OSC" refers to the Order to Show Cause why Defendant should not be held in contempt, issued on October 3, 2017. (Doc. 48.)

[16] "Sack Ltr. Opp. Cont." refers to the letter of Jonathan Sack arguing Defendant should not be held in contempt, filed on October 6, 2017. (Doc. 49.)

(*Id.* ¶ 92.)  One of these storage devices (the "External Hard Drive") contained SmartStream documents.  (*Id.* ¶ 93.)  The iMac contained SmartStream documents as well. (*Id.* ¶ 97–98.)[17]

## II.   **Procedural History**

SmartStream commenced this action on April 5, 2017 by filing a Complaint, (Doc. 1), and a proposed Order to Show Cause for a temporary restraining order and preliminary injunction with supporting documents, (Docs. 13–16).  I issued the Temporary Restraining Order and Order to Show Cause to obtain a preliminary injunction ("TRO") on April 13, 2017.  (Doc. 16.)  On May 10, 2017, Chambadal submitted his papers in opposition to SmartStream's motion for a preliminary injunction.  (Docs. 25–27.)  On May 17, 2017, I held a hearing on SmartStream's motion for preliminary injunction and directed the parties to submit a proposed consent order for injunction.  On May 24, 2017, Chambadal filed his Answer, asserting counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, accounting, unjust enrichment, and tortious interference of contract.  (Doc. 30).

The parties submitted a proposed injunction order on July 28, 2017.  (Doc. 38-1.)  I issued the injunction order on August 1, 2017.  (Doc. 40.)  On September 29, 2017, SmartStream filed a letter motion requesting a conference regarding its proposed "motion for order to show cause why Defendant Chambadal should not be held in contempt" for failing to comply with the injunction order.  (Doc. 46.)  I did not hold a conference but on October 3, 2017, I issued an Order to Show Cause why Chambadal should not be held in contempt for failing to comply with the terms of the Injunction.  (Doc. 48.)  Chambdal filed a letter in opposition on October 6, 2017.

---

[17] Although Chambadal's responses to these two 56.1 entries is "Deny," he does not actually deny that the iMac contained SmartStream documents and information but rather claims only that he did not *know* the iMac contained such documents.  (*See* Def.'s Resp. 56.1 ¶¶ 97–98 ("Defendant did not know that they were confidential SmartStream files on the iMac."); Def.'s Aff. ¶ 6 ("I was unaware that [customer contracts] were contained on the Mac.").)  Defendant's memorandum of law in opposition to Plaintiff's motion also does not argue that the iMac did not contain SmartStream documents.  Accordingly, I deem this matter undisputed.

(Doc. 49.)  I held the show cause hearing on October 12, 2017, at which I directed the parties to meet and confer regarding the matters discussed.

On August 29, 2017, SmartStream moved to dismiss Chambadal's counterclaims.  (Doc. 42.)  Chambadal filed his memorandum of law in opposition on September 9, 2017, (Doc. 45), and SmartStream filed its reply memorandum of law on October 3, 2017, (Doc. 47).  On March 31, 2018, I granted the motion in full, dismissing all of Chambadal's counterclaims, but filed my Opinion and Order under seal because it relied upon material that the parties had deemed confidential.  (Doc. 51.)  After providing the parties with time to propose redactions, the Opinion and Order was filed on the public docket without redactions on April 16, 2018.  (Doc. 54.)

SmartStream filed the instant motion for summary judgment on February 15, 2019, (Doc. 69), along with its Rule 56.1 Statement and supporting exhibits, (Doc. 70), a memorandum of law, (Doc. 71), and supporting declarations with exhibits, (Docs. 72–74).  Several of these exhibits were filed under seal.

Chambadal filed his papers in opposition to SmartStream's motion on April 12, 2019, including the declaration of his attorney Jonathan Sack with exhibits, (Doc. 78), his Response to SmartStream's Rule 56.1 statement, (Doc. 79), and his memorandum of law, (Doc. 80).  Chambadal's purported affidavit in opposition to summary judgment, annexed as Exhibit A to the Sack Declaration opens with the following introductory language: "PHILIPPLE [sic] CHAMBADAL, being duly sworn, deposes and says:" [sic].  (Doc. 78-1, at 1.)  The document is signed and dated but is not notarized.  (*Id.* at 5.)  It contains no language suggesting that it was subscribed as true under penalty of perjury.  (*See generally id.*)

On May 8, 2019, SmartStream filed a letter requesting a conference on a proposed motion to strike Doc. 78-1, arguing that the document was not a valid affidavit or declaration

because it was not notarized or submitted under penalty of perjury.  (Doc. 81.)   In addition, on

May 10, 2019, SmartStream filed its reply in further support of its motion for summary

judgment.  (Doc. 84.)  On May 10, 2019, Chambadal's counsel filed a letter response explaining

that Chambadal was overseas when the Doc. 78-1 was filed and could not have it notarized.

(Doc. 83.)  On the same date, Chambadal also filed a new statement containing the following

introductory language: "I, PHILIPPLE [sic] CHAMBADAL, being first duly sworn, state under

the penalty of perjury as follows, based on personal knowledge:."  (Doc. 82.)  The new statement

was notarized on May 9, 2019 in New York County.  (*Id.* at 5).  Aside from these two changes,

the two affidavits contain identical text.  (*See id.*; Doc. 78-1.)

    The Court denied SmartStream's request for a conference on May 13, 2019, (Doc. 85),

and SmartStream filed a motion to strike Docs. 78-1 and 82 on May 16, 2019, (Doc. 86), along

with a memorandum of law in support, (Doc. 87).  Chambadal filed its memorandum of law in

opposition to this motion on May 30, 2019.  (Doc. 88.)  SmartStream filed its reply on June 6,

2019.  (Doc. 89.)

## III.    Legal Standard

    "Summary judgment is appropriate when "the parties' submissions show that there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law." *Fay v. Oxford Health Plan,* 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P.

56(a). "[T]he dispute about a material fact is 'genuine[ ]' ... if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be

counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists; if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in its favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Additionally, in considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

IV.    **Discussion**

      A.    ***SmartStream's Motion to Strike***

I first resolve SmartStream's motion to strike in order to establish the record on which SmartStream's motion for summary judgment will be decided.  SmartStream argues that Document 78-1, Chambadal's initial statement in opposition to summary judgment, was not an affidavit because it was not properly sworn, and was not a declaration because it was not submitted under penalty of perjury as to the truth of its contents.  (Pl.'s Mem. Strike 4–5.)[18] Therefore, SmartStream argues, it is inadmissible evidence that cannot be considered for purposes of summary judgment and must be stricken.  (*Id.*)  SmartStream does not dispute the admissibility of Document 82, Chambadal's second statement, but argues that because it was filed untimely without leave of court, it should be stricken from the record.  (*Id.* at 5–6.) SmartStream contends that the Federal Rules of Civil Procedure provide that where an act "may or must be done within a specified time," an extension requested after the expiration of that time must be made on motion with a showing of excusable neglect, and that Chambadal's failure to do so here is fatal to the affidavit.  (*Id.* at 5 (citing Fed. R. Civ. P. 6(b), (c); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 895–98 (1990)).)

A party opposing summary judgment and asserting there is a triable issue of material fact must do so with evidentiary proof in admissible form, including affidavits and declarations.  Fed. R. Civ. P. 56; *see also* Local Civil Rule 56.1(d) ("Each statement by the . . . opponent . . . including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible.").  An affidavit is a document sworn to be true.

---

[18] "Pl.'s Mem. Strike" refers to Plaintiff's memorandum of law in support of its motion to strike, filed on May 16, 2019.  (Doc. 87.)

*DeMars v. O'Flynn*, 287 F. Supp. 2d 230, 242 (W.D.N.Y. 2003) (citing 11 Moore's Federal

Practice, § 56.14[1][b] (Matthew Bender 3d ed)).   A declaration may be unsworn, but must be

subscribed as true under penalty of perjury "in *substantially* the following form: . . . 'I declare (or

certify, verify, or state) under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct. Executed on (date).  (Signature)'."   28 U.S.C. § 1746

(emphasis added).  A statement that is neither sworn nor made under penalty of perjury is not

sufficient to defeat a motion for summary judgment.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144,

158 n.17 (1970); *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65 (2d

Cir. 1999); *United States v. All Right, Title & Interest in Real Prop. & Appurtenances*, 77 F.3d

648, 657–58 (2d Cir. 1996).

        Although Document 78-1 is styled as an affidavit and claims to be "duly sworn,"

Chambadal did not actually swear to it before a witness or sign it under oath.  This omission

renders the "duly sworn" language meaningless, in much the same way that an unsworn

document cannot be converted to an affidavit by the mere addition of a notary stamp to the

signature.  *See, e.g*, *DeMars*, 287 F. Supp. 2d at 242–243.  *Cf. Porter v. Quarantillo*, No. 12–

CV–0590 (DLI)(VMS), 2012 WL 6102875, at *5 (E.D.N.Y. Dec. 7, 2012), *aff'd*, 722 F.3d 94

(2d Cir. 2013) (considering affidavits that did not contain "penalty of perjury" language because

they were "'duly sworn' before a notary public").  Nor is Document 78-1 a declaration; the

statute is clear that a declaration must be "subscribed as true under penalty of perjury," which

Document 78-1 is not.  Because Document 78-1 is not a proper affidavit or declaration, I will not

consider it in opposition to SmartStream's motion for summary judgment, and it is stricken from

the record.  *See Martinez v. Zero Otto Nove, Inc.,* No. 15 Civ. 899 (ER), 2016 WL 3554992, at

*3 (S.D.N.Y. June 23, 2016); *Shamrock Power Sales, LLC v. Scherer,* No. 12–CV–8959 (KMK),

2015 WL 5730339, at *18 (S.D.N.Y. Sep. 30, 2015); *Romero v. H.B. Auto. Grp., Inc.*, No. 11

Civ. 386(CM), 2012 WL 1514810, at *2 (S.D.N.Y. May 1, 2012).

However, Document 82 is both sworn before a notary public and subscribed to under

penalty of perjury.  It is otherwise identical to Chambadal's initial statement opposing summary

judgment. (*See* Docs. 78-1, 84.)  It is therefore in the proper form to be considered an affidavit

and a declaration.

SmartStream's argument that Chambadal was required to seek an extension of time on

motion misreads the Federal Rules and the cases it cites.  Federal Rule of Civil Procedure 6(b)

provides that "[w]hen an act may or must be done within a specified time, the court may . . .

extend the time . . . with or without motion . . . if a request is made, before the original time or its

extension expires . . . or . . . on motion made after the time has expired if the party failed to act

because of excusable neglect."  Rule 6(c) further provides that an affidavit opposing a motion

must be served "at least [seven] days before the hearing, unless the court permits service at

another time."  In *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 881 (1990), the United States

Supreme Court affirmed the district court's rejection of affidavits in opposition to summary

judgment submitted after the hearing on the motion as untimely under prior Rule 6(d), which

provided that opposing affidavits could not be served later than one day before a hearing.  *See*

*also Shapiro v. Cantor*, 123 F.3d 717, 722 (2d Cir. 1997) (rejecting as untimely an affidavit filed

by one of the plaintiffs two months after the hearing on his motion for leave to the complaint).

No hearing was scheduled on SmartStream's motion and so there was no deadline within

which the affidavit needed to be filed; therefore, Rule 6(b)'s requirement that the request be

made upon motion does not apply.  It is within my discretion to choose to accept a later filed

affidavit.  In my view, Chambadal submitted the affidavit sufficiently ahead of time for this court

to consider it, and SmartStream, too, had sufficient time to respond to it given that it contains the exact same allegations as Chambadal's initial affidavit in opposition to SmartStream's motion. *See United States v. Kirsteins*, No. 87–CV–964, 1990 WL 208722, at *2 (N.D.N.Y. Dec. 3, 1990). SmartStream does not assert it would be prejudiced by the acceptance of the affidavit, nor does it provide any other substantive reason it should be excluded. Accordingly, I will consider Document 82 for the purposes of this motion.

### B.   *SmartStream's Motion for Summary Judgment*

SmartStream moves for summary judgment on all three of its claims against Chambadal: (1) breach of contract; (2) trade secrets misappropriation under New York law; and (3) violation of the DTSA. SmartStream also seeks attorneys' fees as damages for Chambadal's alleged breach of contract, and punitive damages for Chambadal's alleged trade secrets violations. I address each claim in turn.

### 1.   Breach of Contract

Under New York law, to establish a breach of contract, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir. 1996). The parties do not dispute that the first two elements are present. An agreement existed between the two parties, namely the 2015 Employee Agreement. (Def.'s Resp. 56.1 ¶ 9; Emp. Agmt.) SmartStream's obligations under that Agreement were to employ Chambadal on an at-will basis and to provide him with confidential information; it is undisputed that SmartStream did so. (Def.'s Resp. 56.1 ¶¶ 9–12, Emp. Agmt. 1.)

As to breach, SmartStream argues that Chambadal violated Section 3 of the Employment Agreement, governing the return of SmartStream property, and Section 2 of the Employee

Agreement, governing confidentiality.  SmartStream further argues that the text of the Agreement demonstrates it was damaged by Chambadal's breach, and that it is entitled to attorneys' fees.  Chambadal admits that he engaged in the conduct alleged by SmartStream, but maintains that there are issues of material fact as to whether that conduct breached the agreement.  I address the alleged breaches in turn, then consider the issues of damages and attorneys' fees.

### a.   The "Breach" Element

#### i.   *Applicable Law*

Under New York law,[19] "the initial interpretation of a contract is a matter of law for the court to decide."  *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (internal quotation marks omitted).  "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous."  *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998).  If the court finds that the contract is not ambiguous, then it falls to the court to determine its meaning as a matter of law.  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).

When interpreting an agreement, the court's "primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.  The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  *Chesapeake Energy Corp. v. Bank of N. Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks and citations omitted).

---

[19] The Employee Agreement contains a New York choice of law clause.  (Emp. Agmt. ¶ 14.)  The parties do not dispute that New York law applies, and both cite only New York law in their briefs.  Accordingly, I apply New York law to this dispute.

If, however, the court finds that the contract is ambiguous, then its meaning is a question of fact and summary judgment is not appropriate. *K. Bell & Assoc.*, 97 F.3d at 637.  A contract is ambiguous if its terms or the inferences drawn from those terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person" familiar with the context of the contract and the business or trade it concerns. *See Alexander & Alexander Servs.*, 136 F.3d at 86 (internal quotation marks omitted).  On the other hand, "[n]o ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Chesapeake Energy Corp.*, 773 F.3d at 114 (citation omitted). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 467 (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). Nor does ambiguity exist where one party's view "strain[s] the contract language beyond its reasonable and ordinary meaning." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 459 (1957)).

Where a contract does not specify a date or time for performance, New York law implies a reasonable time period. *Savasta v. 470 Newport Assocs.*, 82 N.Y.2d 763, 765 (1993); *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007).  What constitutes a reasonable time period depends upon the facts and circumstances of the particular case, *Savasta*, 82 N.Y.2d at 765, including "the subject matter of the contract, the situation of the parties, their intention, what they contemplated at the time the contract was made, and the circumstances surrounding

performance," *Boehner v. Heise,* 734 F. Supp. 2d 389, 408 (S.D.N.Y. 2010); *Wachovia Bank of Ga., N.A. v. Apex Tech of Ga., Inc.*, 144 B.R. 649, 655 (S.D.N.Y. 1992).

Thus, when no time for performance is specified, whether a particular time is reasonable—or, put differently, whether performance was completed within a reasonable time—is a question for the trier of fact, unless the facts are undisputed.  *See Baisch, Inc. v. Pike Co.*, 959 N.Y.S.2d 786, 787 (4th Dep't 2013) (denying summary judgment because record did not contain evidence of what would be a reasonable time and issue could not be determined as a matter of law); *Lia v. Saporito*, 909 F. Supp. 2d 149, 162–63 (E.D.N.Y. 2012), *aff'd*, 541 F. App'x 71 (2d Cir. 2013) (whether delay in contract performance was reasonable could not be determined as a matter of law); *Boehner v. Heise,* 734 F.Supp.2d at 408 (denying summary judgment dismissing the plaintiff's breach of contract claim because there was an issue of fact as to whether the delay in the defendant's performance was reasonable).

> ii.     *Application:  Section 3 of the Employee Agreement*

Under Section 3 of the Employee Agreement, Chambadal agreed to return SmartStream's property "as and when requested by the Company" and/or "immediately upon termination of [his] employment for any reason.  (Emp. Agmt. ¶ 3.)  In either case, he agreed that he would "keep no copies."  (*Id.*)  SmartStream argues that Chambadal violated Section 3 of the Employee Agreement, governing the return of SmartStream property, by not returning the MacBook and Blackberry until February 16, 2017, by making and retaining the Mirror Image of the MacBook, and by retaining copies of SmartStream documents on the External Hard Drive, on the iMac, and in his personal e-mail accounts, until October and November of 2017.  (Pl.'s Mem. 8–10).[20]

---

[20] "Pl.'s Mem." refers to Plaintiff's memorandum of law in support of its motion for summary judgment, filed on February 15, 2019.  (Doc. 71.)

Chambadal does not dispute that he engaged in these acts, but argues that that they did not violate the Employee Agreement because (1) his return of the Macbook and Blackberry was timely given that the Employee Agreement did "not specify a time period to return the devices," (2) because the Mirror Image was made "for the sole purpose of preserving evidence," and (3) because he did not know there were SmartStream files on the iMac and External Hard Drive. (Def.'s Mem. 2–3.)[21]

Although the parties do not explicitly urge different interpretations of Section 3, their opposing views on whether Chambadal's conduct constituted a breach ultimately amount to a dispute over what precisely the text requires.  "[A]mbiguity is detected claim by claim, because a contract may be ambiguous when applied to one set of facts but not another." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005) (internal quotation marks omitted). Accordingly, I address the interpretation of Section 3 separately with respect to each of Chambadal's acts that SmartStream contends breached the contract.

- **Returning the MacBook and Blackberry on February 16, 2017**

Chambadal returned the MacBook and BlackBerry six weeks after SmartStream notified him that his employment was being terminated and requested the devices back, (Def.'s Resp. 56.1 ¶ 69), but before his formal date for the termination of his employment, April 4, 2017, (*see* Term. Not. (stating that Plaintiff's "employment with [Defendant] terminates as of and effective on the Separation Date," which was April 4, 2017).)  This conduct does not violate the "immediately upon termination" clause of the Employee Agreement.  The Termination Notice is clear that April 4, 2017 was to be the date of the termination of Chambadal's employment, and

---

[21] "Def.'s Mem." refers to Defendant's memorandum of law in opposition to SmartStream's motion for summary judgment, filed on April 12, 2019.  (Doc. 80.)

Chambadal returned the devices before that date.  The question then is whether his return violated the "as and when requested" clause.

Given that Agreement does not contain a deadline, Chambadal contends, his return of the SmartStream Devices was timely.  (Def.'s Mem. 2.)  Some of the assertions in the record suggest that six weeks may have been reasonable under the circumstances:  Chambadal testified at his deposition that he was traveling in the days immediately following the meeting where he was notified of his termination.  (Def.'s Dep. 122:13-124:3; Dep. Ex. 13.)  His counsel asserts that Chambadal gave him the devices to his counsel on February 7, 2017 to coordinate returning them to SmartStream.  (Sack Affirm. Opp. TRO ¶ 16.)  The devices were then given to SmartStream on February 16, 2017.  (Def.'s Resp. 56.1 ¶ 69.)

Given that the facts relevant to reasonableness are disputed, on the record before me, I cannot determine as a matter of law whether six weeks was a reasonable time for performance.  *See Boehner*, 734 F. Supp. 2d at 408.  Summary judgment is inappropriate on this portion of SmartStream's breach of contract claim.

- **Making the Mirror Image of the MacBook**

Chambadal's counsel, Jonathan Sack, undisputedly hired a third party to make the Mirror Image—a wholesale copy—of the contents of the MacBook, which belonged to SmartStream and which contained SmartStream documents.  (Def.'s Resp. 56.1 ¶ 66; Def.'s Dep. 124:20–23.)  Making and retaining the Mirror Image unambiguously violates the plain language of Section 3, which mandates that Chambadal "keep no copies" of SmartStream property upon his termination.  (Emp. Agmt. ¶ 3.)

The fact that it was Chambadal's counsel who purportedly directed or orchestrated that a copy be made does not insulate Chambadal.  A principal is liable for the acts of his agent

committed within the scope of his actual or apparent authority.  Restatement (Third) of the Law

Governing Lawyers § 26 (2000); *Sec. Pac. Mortg. & Real Estate Servs., Inc. v. Herald Ctr., Ltd.*,

891 F.2d 447, 448 (2d Cir. 1989).  Whether there is an agency relationship between two parties

is a mixed question of law and fact.  *Cabrera v. Jakabovitz*, 24 F.3d 372, 385 (2d Cir. 1994).

Generally, however, an attorney and his client stand in an agent-principal relationship as a matter

of law, and so clients "must be held accountable for the acts and omissions of their attorneys."

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993); *See also*

*Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 789, 797 (S.D.N.Y. 2011) (equating

attorney/client relationship with agent/principal relationship*); Colli v. Wirth*, No. 94 Civ. 3234

(LBS), 1996 WL 243237, at *10 (S.D.N.Y. May 10, 1996) (find that attorney was client's agent);

*Bridge C.A.T. Scan Assocs. v. Ohio-Nuclear Inc.*, 608 F. Supp. 1187, 1197 (S.D.N.Y. 1985)

("[A] client may be responsible for statements made for the purpose of aiding, and within the

scope of, his legal representation"); *Chase Manhattan Bank, N.A. v. Perla*, 411 N.Y.S.2d 66, 69

(4th Dep't 1978) (finding client liable as principal for the fraudulent acts of her attorney-agent

committed within the scope of his authority as well as for acts outside his authority but later

ratified).

Here, the undisputed facts show that Sack was Chambadal's attorney, and was acting in

that capacity and on his behalf when he arranged to have the Mirror Image of the MacBook

made.  By the end of January, Chambadal had retained Sack as his counsel and Sack was

communicating with SmartStream's counsel on Chambadal's behalf.  (*See* Sack Affirm. Opp.

TRO ¶¶ 13-22, Exs. A, B.)  Sack then informed SmartStream's counsel that he would be hiring a

forensic firm to make a mirror image of the laptop in order to preserve the contents of the laptop

in response to SmartStream's "vague threats of litigation," (*id.*), and did so on February 9, 2017,

(Def.'s 56.1 ¶ 5).  Given that Sack made the Mirror Image explicitly for litigation purposes, and represented the same to SmartStream, it is apparent that Sack was acting within the scope of his actual authority as Chambadal's attorney and agent and so his acts are attributable to Chambadal.

Chambadal offers as a defense that making the Mirror Image was not a breach because he did so "for the sole purpose of preserving evidence" after "SmartStream's counsel made vague threats of litigation, and thus the Sack Firm became concerned that the devices being returned to Mr. Chambadal would be tampered with."  (Def.'s Mem. 2.)  Chambadal provides no basis for leveling this serious accusation at opposing counsel, and no authority to support his argument that his purported fear justified his breach.  Indeed, the fact that Chambadal and his counsel made a strategic decision to create the Mirror Image for whatever reason does not excuse Chambadal's breach.[22]

Chambadal is liable for breach of contract as a matter of law on the basis of his copying the contents of SmartStream's MacBook, in contravention of the plain language of the Employee Agreement.

- **Retaining electronic copies of SmartStream documents until November 9, 2017**

Between April 4, 2017—the Separation Date in the Notice of Termination—and November 9, 2017, Chambadal retained electronic copies of SmartStream documents in different forms.  He possessed the External Hard Drive, and a USB flash drive on which documents from the MacBook had been backed up—although he suggests this was inadvertent and that he only intended to back up his personal photographs—which he returned on October 27, 2017, (*see*

---

[22] Although Chambadal claims that the Mirror Image was created "for the sole purpose of preserving evidence" after "SmartStream's counsel made vague threats of litigation, and thus the Sack Firm became concerned that the devices being returned to Mr. Chambadal would be tampered with," (Def.'s Mem. 2), there is evidence in the record that could support an inference that the Mirror Image was created as part of Chambadal's efforts to obtain post-termination compensation.  (*See* Compl. Ex. C, D; Def.'s Resp. 56.1 ¶¶ 50, 55–59.)

Def.'s Resp. 56.1 ¶¶ 91, 93–95), nearly seven months after the date of termination of his

employment, (*see* Term. Not. 1), three months after swearing in an affidavit that he possessed no

SmartStream documents, (Def.'s Inj. Aff. ¶ 11), and three months after being restrained from

possessing SmartStream documents or data, and ordered to turn all such documents and data

over to SmartStream, (Inj. ¶¶ 1–3).  He also retained a handful of documents on his personal e-

mail account and on his iMac, the latter of which he delivered to CFP for inspection on

November 9, 2017.  (Def.'s Resp. 56.1 ¶ 92.)  Chambadal argues that "the mere timing of his

delivery of these additional personal devices" does not violate the Employee Agreement.  (Def.'s

Mem. 3.)

     Chambadal appears to suggest that under Section 3, he was allowed to return

SmartStream property at any time, so long as he returned it eventually.  It is true that the "as and

when requested" clause required return only within a reasonable time after SmartStream's

request; however, the same is not true of the clause requiring return "immediately upon

termination."  Chambadal's interpretation would render the phrase "immediately upon

termination" entirely meaningless, straining the language "beyond its reasonable and ordinary

meaning," *Seiden Assocs., Inc.*, 959 F.2d at 428, and violating the Court's duty to assign

meaning to "*all* words and phrases . . . their plain meaning," *see Gary Friedrich Enters., LLC v.

Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (emphasis added) (internal quotation

marks omitted).  "Unless otherwise indicated, words should be given the meanings ordinarily

ascribed to them and absurd results should be avoided."  *Mastrovincenzo v. City of New York*,

435 F.3d 78, 104 (2d Cir. 2006) (internal quotation marks omitted).

     The word "immediately" possesses a definite and precise ordinary meaning; it is defined

consistently by contemporary dictionaries to mean "occurring without delay," Black's Law

Dictionary (10th ed. 2014) (defining "immediate"), "without delay," The American Heritage Dictionary of the English Language (5th ed. 2011), "promptly, with expedition, with reasonable haste consistent with fair business activity," Merriam Webster's Collegiate Dictionary (10th ed. 1998), "without any delay or lapse of time," The Oxford English Dictionary (2nd ed. 1989). *Cf. Battaglia v. United States*, 199 F. Supp. 834, 836 (S.D.N.Y. 1961), *aff'd*, 303 F.2683 (2d Cir. 1962) ("'Forthwith' means immediately, without delay, or as soon as the object may be accomplished by reasonable exertion."). In light of the plain meaning of the words contained in Section 3, Chambadal's suggested interpretation is meritless.

Accordingly, giving the words of Section 3 their ordinary meaning, I find that it unambiguously required Chambadal to return SmartStream's property, including documents and data, upon termination of his employment, expeditiously and without delay, and to not retain any copies of that property. (Emp. Agmt. ¶ 3.) In light of that meaning, I find that no reasonable jury could conclude that Chambadal had complied with that requirement when he retained SmartStream documents on a USB flash drive, his iMac and his email accounts for seven months after the termination of his employment. Accordingly, summary judgment is appropriate. *See, e.g.*, *Adler v. Solar Power, Inc.*, No. 16 CV 1635-LTS-GWG, 2018 WL 1626162, at *9 (S.D.N.Y. Mar. 30, 2018) (granting summary judgment in favor of plaintiff's breach of contract claim where contract language was unambiguous and defendant's conduct was undisputed); *Sunoco, Inc. (R & M) v. 175-33 Horace Harding Realty Corp.*, 969 F. Supp. 2d 297, 304 (E.D.N.Y. 2013) (same), *aff'd sub nom. Sunoco, Inc. (R&M) v. 175-33 Horace Harding Realty Corp.*, 697 F. App'x 38 (2d Cir. 2017); *Porky Prod., Inc. v. Nippon Exp. U.S.A. (Illinois), Inc.*, 1 F. Supp. 2d 227, 234 (S.D.N.Y. 1997) (same), *aff'd sub nom. Porky Prod., Inc. v. Nippon Express U.S.A. (Illinois), Inc.*, 152 F.3d 920 (2d Cir. 1998).

Chambadal's claims that he did not know the documents were saved on the External Hard Drive, his iMac, and his e-mail accounts are unavailing.  The intention behind a party's breach has no impact on his liability.  *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 547 (1903); *Koufakis v. Carvel*, 425 F.2d 892, 906 (2d Cir. 1970) ("A breach is a breach; it is of marginal relevance what motivations led to it"); *Awards.com, LLC v. Kinko's, Inc.*, 834 N.Y.S.2d 147, 155 (1st Dep't 2007), (holding that the breaching party's "subjective intention or willingness to perform its obligations is irrelevant"), *aff'd*, 14 N.Y.3d 791 (2010); *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 202 (S.D.N.Y. 2006) (granting summary judgment for plaintiff on its breach of contract claim where defendant failed to perform contract by accident, as a result of its own error); *Agron v. Trs. of Columbia Univ. in N. Y.*, No. 88 Civ. 6294 (MJL), 1993 WL 118495, at *4 (S.D.N.Y. Apr. 12, 1993) (finding that, even if unintentional, defendant's act in violation of contract was a breach).

        iii.   *Application: Section 2 of the Employee Agreement*

SmartStream also argues, in a footnote, (Pl.'s Mem. 10–11 n.2), that Chambadal breached Section 2 of the Employee Agreement by e-mailing three SmartStream documents to outside third parties:  (1) an attachment entitled STL Corporate Q4 2016.pptx ("Corporate Q4 PowerPoint") on January 27, 2017;[23] (2) a document labeled "SmartStream corporate overview.pdf" ("Corporate Overview") on May 19, 2017;[24]  and (3) a document called ███████████ Validate Trade – Smartstream.pptx" ("█████████ Schematic") on June 29, 2017.[25]  (Dep Ex. 15 at AXIOM 0000102–03.)  Chambadal does not respond to this argument in

---

[23] The Corporate Q4 PowerPoint was filed under seal on February 15, 2019, as Exhibit A to the Walker Declaration, (Doc. 73.)

[24] The Corporate Overview is located at AXIOM0000101 of Dep. Ex. 15, filed February 15, 2019 as Exhibit 13 to Plaintiff's Rule 56.1 Statement.  (Doc. 70-13.)

[25] The ███████ Schematic is located at AXIOM0000102–03 of Dep. Ex. 15, filed February 15, 2019 as

his opposition.  An argument that "appear[s] only in [a] footnote [is] not properly raised, and the Court is under no obligation to consider [it]."  *Weslowski v. Zugibe,* 96 F. Supp. 3d 308, 314 (S.D.N.Y.) (citing *United States v. Restrepo,* 986 F.2d 1462, 1463 (2d Cir.1993)), *aff'd,* 626 F. App'x 20 (2d Cir. 2015).  However, in the interests of being thorough, I briefly address why I find this argument lacking.

Section 2 of the Employee Agreement is entitled "Confidentiality" and provides, in pertinent part, that the employee will "keep in confidence and trust all Proprietary Information," which is defined as "non-public information [in all forms] which the Company possesses or has possessed from time to time."  (Emp. Agmt. ¶¶ 1, 2.)  The obligation explicitly does not apply to "non-proprietary information which is generally known to the general public."  (*Id.* ¶ 2.)

As discussed at greater length *infra,* there is a dispute of material fact as to whether the Corporate Q4 PowerPoint contains trade secrets.  SmartStream has provided no information about the other two documents to support its contention that they contain "Proprietary Information" within the meaning of the Employee Agreement.  Chambadal, in contrast, alleges that the contents of both documents are public.  He asserts that many of the diagrams in the documents are available online, and/or were disseminated to prospective clients and at trade shows.  (*Id.* at 17–18.)

Therefore, a genuine issue of material fact exists as to whether the three documents e-mailed by Chambadal to third parties constituted "Proprietary Information" within the meaning of the Employee Agreement.  Summary judgment on this portion of SmartStream's claim is denied.

---

Exhibit 13 to Plaintiff's Rule 56.1 Statement.  (Doc. 70-13.)

b.   The "Damages" Element

SmartStream has established as a matter of law the "breach" element of the portions of its

contract claim that are premised on Chambadal's retention of the Mirror Image of the MacBook

and the SmartStream files he retained on the External Hard Drive, the iMac, and his e-mail

accounts until October 27, 2017 and November 9, 2017.   SmartStream argues that the damages

element of its breach of contract claim is satisfied by language in the Agreement acknowledging

that "it may be difficult to measure any damages . . . which might result from any breach" by

Chambadal.  (Pl.'s Mem. 12–13.)

Here, SmartStream has satisfied the damages element by demonstrating Chambadal's

breach as a matter of law even in the absence of that contractual language.  "[E]ven if

[a] breach of contract caused no loss or if the amount of the loss cannot be proven with sufficient

certainty, the injured party is entitled to recover as nominal damages a small sum fixed without

regard to the amount of the loss, if any."  *Hallingby v. Hallingby*, 693 F. Supp. 2d 360, 369

(S.D.N.Y. 2010) (internal quotation marks omitted), *aff'd*, 453 F. App'x 121 (2d Cir. 2012) ;

*Freund v. Wash. Square Press, Inc.,* 34 N.Y.2d 379, 384 (1974) (awarding nominal damages "as

a formal vindication of [the] plaintiff's legal right to compensation which has not been given a

sufficiently certain monetary valuation.").

c.   Attorneys' Fees

Finally, SmartStream requests an award of attorneys' fees and costs in the amount of

$339,601 and expert fees in the amount of $12,135.  (Pl.'s Mem. 11–12, 21.)  SmartStream

argues it is entitled to such fees pursuant to Section 9 of the Employee Agreement, "Injunction &

Damages," under which Chambadal agreed to: "indemnify and hold harmless the Company from

costs and expenses (including attorneys' and expert fees) damages, liabilities or obligations from

any actions, suits, proceedings, claims, demands arising from, growing out of or in any way connected with the violation or non-performance by me of this Agreement." (Emp. Agmt. ¶ 9.) SmartStream supports the specific amount of its request with a list of the general categories of legal services provided by the law firm, a sworn statement of the amount owed, and a footnote offering to submit redacted legal bills for in camera inspection. (Hill Decl. ¶¶ 7–11.)[26]

### i. *Applicable Law*

Under New York law, parties may agree that attorneys' fees should be included as another form of damages for breach of contract. However, courts should strictly construe all such contracts and avoid "infer[ring] a party's intention' to provide counsel fees as damages for a breach of contract 'unless the intention to do so is unmistakably clear' from the language of the contract." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 177 (2d Cir. 2005) (internal quotation marks omitted). In particular, courts have declined to read an attorneys' fees provision to cover claims between the parties themselves where the indemnification language "may easily be read as limited to third party actions." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 21 (2d Cir. 1996); *see also Mid-Hudson Catskill*, 418 F.3d at 177. However, where the contract is unlikely to give rise to any legal action except between the parties themselves, indemnification language more probably reflects an intent to award attorneys' fees as damages. *See Hooper Assocs., Ltd. v. AGS Computs., Inc.,* 74 N.Y.2d 487, 492 (1989) (discussing *Breed, Abbott & Morgan v. Hulko*, 531 N.Y.S.2d 240, 241 (1st Dep't 1988), *aff'd*, 74 N.Y.2d 686 (1989).

---

[26] "Hill Decl." refers to the Declaration of Megan Hill in support of Plaintiff's motion for summary judgment, filed February 15, 2019. (Doc.74.)

ii. *Application*

The indemnification clause in the Employee Agreement refers to attorneys' fees and expert fees "arising from, growing out of or in any way connected with the violation or non-performance by me of this Agreement." (Emp. Agmt. ¶ 9.) It appears at the end of a paragraph entitled "Injunction & Damages," in which Chambadal also agrees that SmartStream would have the ability to obtain an injunction or other appropriate equitable relief against him for any breach or proposed breach.

The indemnification clause thus clearly contemplates the payment of fees arising out of the pursuit of such relief, which would be an action between the parties themselves. More generally, the Employee Agreement is primarily inward-facing; in other words, any breach by Chambadal would affect SmartStream alone. Because third parties would not be affected, it is "difficult, if not impossible, to ascertain" what other type of legal action Chambadal might have been agreeing to provide indemnification. *See Hooper Assocs.,* 74 N.Y.2d at 492. As a result, I find that that the language of the indemnity clause, considered in conjunction with the preceding text and with the purpose of the Employee Agreement as a whole, indicates "unmistakably" the parties intended for it to apply to actions between the parties. *See Mid-Hudson Catskill*, 418 F.3d at 177. SmartStream is entitled to attorneys' fees incurred in this action as a result of Chambadal's breach of contract.

The amount awarded under this provision must be limited to the amount of "losses and liabilities [the party seeking fees] has actually incurred." *Id.* at 179 (observing that a claim for indemnity requires that an actual liability be sustained by an indemnitee); *see also W6 Facility X, LLC v. W. 6 Care Ctr., Inc.*, 95 N.Y.S.3d 95, 97 (2d Dep't 2019) (denying summary judgment on

plaintiff's request for a specific amount of attorneys' fees where the motion was "not supported by proper evidence substantiating the amount of attorney's fees.").

SmartStream's support for the specific dollar amount in fees it requests is sparse, limited to a declaration by counsel describing the amount of fees owed and a list of the general categories of services rendered.  Without additional evidence substantiating SmartStream's claims of what services were actually rendered and therefore what fees are actually owed, the court cannot determine if the amount requested is reasonable and warranted.  Therefore, SmartStream's request for a specific award is denied at this time.  Because the issue of Chambadal's liability on the remainder of SmartStream's breach of contract claim has not yet been resolved, SmartStream is directed to submit any motion for attorneys' fees at the conclusion of the matter.

### 2.  Trade Secrets Misappropriation Under State Law

#### a.  Applicable Law

"To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate:  (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *N. Atl. Instruments, Inc. v. Haber,* 188 F.3d 38, 43–44 (2d Cir.1999).  "A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it."  *Id.* at 44 (citation omitted).  In determining whether information constitutes a trade secret, New York courts apply the following factors from the Restatement of Torts:

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3)

> the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting *Ashland Mgmt., Inc. v. Janien,* 82 N.Y.2d 395 (1993)).  Of these factors, the most important consideration is whether the claimant kept the information kept secret.  *Lehman v. Dow Jones & Co.,*783 F.2d 285, 298 (2d Cir.1986); *see also Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985)*.*  Secrecy is generally a question of fact.  *Lehman*, 783 F. 2d at 298; *Ashland Mgmt.*, 82 N.Y.2d at 407.

### b.  Application

SmartStream contends that Chambadal misappropriated trade secrets by e-mailing the Corporate Q4 Presentation to a third party, in breach of his duty not to disclose trade secrets pursuant to the 2015 Agreement. (Pl.'s Mem. 13–16.)  It is undisputed that Chambadal e-mailed the presentation and that he had a duty not to disclose trade secrets.  (Def.'s Mem. 3–5; Def.'s Resp. 56.1 ¶¶ 9, 52, Def.'s Aff. ¶ 21.)  However, there remains an issue of fact concerning whether the Corporate Q4 Presentation actually contained trade secrets.

According to SmartStream, SmartStream "possessed a variety of trade secrets" as a matter of law, namely "service fees, software fees, contract values, actual and expected revenue by customer, revenue over time by client, and information concerning pipelines for new deals," which SmartStream avers Chambadal admitted were confidential, valuable categories of information.  (Pl.'s Mem. 14–15.)  SmartStream states that it took measures to keep such confidential information secret, including by labeling documents as confidential and limiting their distribution, (Kaddoura Decl. ¶¶ 16, 27; Dep. Exs. 4, 6),[27] requiring employees to sign

---

[27] "Kaddoura Decl." refers to the Declaration of Haytham Kaddoura in support of SmartStream's motion for

confidentiality agreements, (Kaddoura Decl. ¶ 27), requiring all SmartStream devices to be password-protected and requiring employees frequently change their passwords, (*id.* ¶ 26), by maintaining written policies governing employee use of SmartStream's electronic information, (*id.* ¶ 28), and requiring employees to use a secure internal file share site to transmit documents containing confidential information, (*id.* ¶ 29).  SmartStream also contends that the presentation Chambadal sent contained "detailed, highly confidential slides disclosing SmartStream's total contract values identified by customer and client, new SmartStream bookings identified by client and revenue, and financial forecasts."  (Pl.'s Mem. 16.)  Curiously, SmartStream does not describe any particular measures it took to keep this specific document secret, and the document itself does not appear to have been marked confidential prior to this litigation,[28] in contrast to other documents submitted by SmartStream.  (*See generally* Pl.'s Mem.; Kaddoura Decl.)

Chambadal does not dispute that SmartStream took measures generally to protect its internal documents, (*see generally* Def.'s Mem.; Def.'s Aff.; *see also, e.g.*, Def.'s Dep. 98:12-99:3 (stating he took measures to avoid signing in to an unsecured electronic device with his SmartStream credentials)), and has admitted that SmartStream possessed trade secrets, (*see* Def.'s Resp. RFA No. 33 (admitting that he possessed SmartStream trade secrets after January 12, 2017); *see also* Def.'s Dep. 66:24-67:10 (fee structure and pricing materials "could" be confidential); *id.* at 67:24-68:13 (contract price and software fee information on contract addendum are something that SmartStream would want to keep confidential); *id.* at 87:5-10 (the

---

summary judgment, filed on February 15, 2019.  (Doc. 72.)

[28] The only confidentiality marking on this document is the phrase "CONFIDENTIAL – ATTORNEY'S EYES ONLY" along the side of each page of the presentation, in the same typeface as the Bates stamp.  The phrases "CONFIDENTIAL" and/or "ATTORNEY'S EYES ONLY" are confidentiality designations agreed to by the parties in their protective order.  (*See* Prot. Ord. ¶ 2.)  Therefore, it appears that this phrase was placed on the Corporate Q4 Presentation in connection with this litigation.  "Prot. Ord." refers to the Stipulated Protective Order submitted by the parties on September 24, 2019, (Doc. 59), and issued by me on September 25, 2018, (Doc. 60).

pages of Exhibit 6 to Defendant's Deposition that list sales quotas and revenues per client are confidential); *id.* at 100:16-101:3 ("what every client spent with" SmartStream constituted trade secrets"); *id.* at 101:17-102:25 ("deal pipelines" and knowledge that a bank is about to close a deal constitute valuable and confidential information); *id.* at 130:24-131:3 (the only SmartStream information that is of value is "[t]he IP, the list of clients and how much are they paying"); *but see id.* at 88:2-7 ("fee structure is never confidential because clients talk.")).  Chambadal argues, however, that the Corporate Q4 presentation in particular was a non-confidential, high-level overview made public by SmartStream itself while Chambadal was employed there.  (Def.'s Mem. 4–5; Def.'s Aff. ¶ 25.)

It is not sufficient for a claim of trade secrets misappropriation to demonstrate that a company *generally* possesses trade secrets; a plaintiff must show that the specific material or information used was a trade secret.  *See N. Atl. Instruments*, 188 F.3d at 43–44.  SmartStream fails to carry its burden on this claim.

First, SmartStream fails to clearly identify all the trade secrets it alleges Chambadal misappropriated.  Although SmartStream list categories of information that it claims are undisputedly trade secrets and that it claims appear in the 44-page PowerPoint—total contract values identified by client and customer, new bookings by client and revenue, and financial forecasts—SmartStream did not specifically identify—until its reply papers—specific slides on which the purported trade secrets appear.  In a footnote in its reply, SmartStream directs the Court to a page identifying "new bookings by customer and value" and pages identifying "the financial amounts contributed to SmartStream by deals with specific clients."  (Pl.'s Reply 7 n.4.)[29]  The pages containing the latter information include charts, graphs, abbreviations, and

---

[29] "Pl.'s Reply" refers to SmartStream's reply in further support of its motion for summary judgment, filed on

terms that SmartStream does not explain and that do not lend themselves to ready interpretation

without additional context.  (Corporate Q4 PowerPoint, at 14–15, 17–18.)  SmartStream does not

identify the page on which the "financial forecast" trade secrets appear.  In light of the fact that

all inferences must be drawn in favor of Chambadal, the nonmoving party, it is impossible to

determine whether the PowerPoint contains trade secrets without more information.  The Court

cannot apply the Restatement factors without specific facts with which to apply them.  *See Next*

*Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 48 (2d Cir. 2018) (summary order) ("To

show that such a process, design, or operation constitutes a trade secret, a party must describe the

trade secret with 'specific and concrete information.'") (quoting *Engleman v. David McKay Co.*,

422 N.Y.S.2d 95, 96 (1st Dep't 1979)); *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 Civ.

9292(DLC), 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008) ("specificity is required before

the court so that the defendant can defend himself adequately against claims of trade secret

misappropriation, and can divine the line between secret and non-secret information, and so that

a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and

misappropriation.").

　　　For example, SmartStream's extensive list of mechanisms it allegedly used to protect

confidential information[30] is of nothing more than general interest without descriptions of how it

protected the secrecy of the specific information contained in the Corporate Q4 PowerPoint.

This is especially problematic because the documents contained in Deposition Exhibits 4 (an

addendum to a client contract) and 6 (a "Finance Report" dated April 2016) appear to have been

---

October 3, 2017.  (Doc. 47.)

[30] Defendant also disputed during his deposition the true extent of SmartStream's confidentiality measures, asserting
that the internal file share system SmartStream points too was not password protected, (Def.'s Dep. 92:15-19), and
noted that a document labeled as "For distribution to the Board and [shareholder] only" was in fact distributed more
broadly than that label suggested, (Def.'s Dep. 91:15-92:14).

labeled "Confidential" at the time they were prepared,[31] the Corporate Q4 PowerPoint contains

no such labeling.  (*See* Dep. Ex. 4, at SmartStream 000003; *id.* Ex. 6, at 000093).

      Combined with this gap in SmartStream's assertions, Chambadal's sworn allegations that

this particular document was not kept secret gives rise to a genuine dispute of fact.  According to

him, the Corporate Q4 Presentation was a "company teaser that the management team used to get

indicative third-party evaluations for the company or to present a high-level view of the health of

the company."  (Def's Aff. ¶ 21.)  He states that he and his coworkers used it "hundreds of times

in presentations to partners, prospects, clients, investors, and bankers," and a similar overview

was "in 2011–2012" to 65 competitor technology companies.  (*Id.* ¶ 25.)  As courts have

observed, marketing materials and other publicly disclosed materials are not trade secrets.  *TNS*

*Media Research, LLC v. TRA Glob., Inc.*, 977 F. Supp. 2d 281, 314–15 (S.D.N.Y. 2013)

      Chambadal also contends that the information contained within the PowerPoint is not

confidential.  For example, the section titled "Total Contract Values" provides just enough

information to understand the company's performance, he argues, but not enough to infringe on

SmartStream's confidential information, as the pricing cannot be understood without the terms

and conditions, the number of users, the breakdown of services vs. software, the length of the

contracts, whether they concern an upfront license vs. a recurring contract.  (Def.'s Aff. ¶¶ 24–

25.)  Similarly, he asserts, the company's cash flow can be found on Companies House, the

---

[31] The contract addendum contained in Exhibit 4 is labeled "CONFIDENTIAL" above the title, in the same serif typeface as the rest of the contract, in contrast to the "CONFIDENTIAL – ATTORNEY'S EYES ONLY" designation at the bottom of the page, which is aligned with the bates stamp and in the same sans serif font.  (*See* Def.'s Dep. Ex. 4.)  As noted above, *supra* n.28, the phrases "CONFIDENTIAL" and/or "ATTORNEY'S EYES ONLY" are confidentiality designations agreed to by the parties in their protective order.  (*See* Prot. Ord. ¶ 2.)  In the Finance Report, the word "CONFIDENTIAL" appears in white type inside of a solid black header bar that also contains the SmartStream logo, which is in the same white typeface.  (*See* Def.'s Dep. Ex. 6.)  Each page also contains the words "Finance Report – Confidential" on the bottom left, in a similar stylish sans serif typeface, which is different from the sans serif from the font used in the confidentiality designation that appears alongside the bates stamps.  (*Id.*)  These features suggest that the documents in Defendant's Deposition Exhibits 4 and 6 were labeled confidential prior to this litigation.

United Kingdom's registrar of companies, although he does not provide a copy of or link to any such reporting.  (*Id.* ¶¶ 7, 23; Def.'s Dep. 83:12-84:9.)

SmartStream's contentions that Chambadal has "undisputedly" admitted that the information in the PowerPoint is confidential, and that his affidavit is self-serving and contradicts his deposition, misrepresents Chambadal's testimony.  During his deposition, Chambadal did acknowledge that "what every client spent with" SmartStream constituted trade secrets, (Def.'s Dep. 100:16-101:3); that "deal pipelines" were confidential, (*id.* at 101:17-102:25); that fee structure and pricing materials "could" be confidential, (*id.* at 66:24-67:10); and that the contract price and software fee information on a contract addendum were details that SmartStream would want to keep confidential, (*id.* at 67:24-68:13).  He also testified that the sales quotas and revenues per client listed in Deposition Exhibit 6, the April 2016 Finance Report, were confidential.  (*Id.* at 87:5-10).

However, during his deposition, Chambadal was asked about and testified about specific documents he was shown.  He was never asked about the Corporate Q4 PowerPoint, which, in the absence of clearer guidance from SmartStream, appears to contain significantly less detail than the documents Chambadal was asked about during his deposition.  For example, the contract addendum lists the contract price and software fee paid by this particular client, but it broke the fee down and specified what exactly that client was paying for.  (*See* Dep. Ex. 4.) Similarly, the Finance Report appears to break down Bookings by customer and by category: "Licence," "RLS," "New Mtce."  (*See Id.* Ex. 6.)  By contrast, the Corporate Q4 PowerPoint appears to list total contract values per client, but does not break them down into components, (Corporate Q4 PowerPoint 14–15, 18), and lists revenues by component, but does not match these with clients, (*id.* at 17).  Most of the contentions in Chambadal's affidavit are therefore

consistent with his deposition testimony.[32]  Drawing all inferences in the Chambadal's favor, a reasonable jury could find the differences between the deposition exhibits and the Corporate Q4 PowerPoint to be material in a way that prevents the information in the Corporate Q4 PowerPoint from rising to the level of a trade secret.

Chambadal's testimony that the amounts paid by clients constitute trade secrets, (Def.'s Dep. 100:16-101:3, 130:24-131:3), and that "deal pipelines" are valuable and confidential information, does not definitively demonstrate that such information is contained in or equates to material in the Corporate Q4 PowerPoint.  Chambadal's testimony was general in nature and whether, and if so how, phrases like "how much they are paying" and "deal pipelines" apply to the Corporate Q4 PowerPoint—a document he was not asked about at his deposition—cannot be determined at this juncture.

It is well settled that secrecy is a fact-intensive inquiry more appropriate for the trier of fact.  *Lehman*, 783 F. 2d at 298; *Ashland Mgmt.*, 82 N.Y.2d at 407.  This case does not deviate from that general principle, and the record before me reveals clear, genuine, material disputes between the parties as to whether the PowerPoint contains SmartStream trade secrets. Summary judgment must be denied.  *See, e.g.*, *Poller v. BioScrip, Inc.,* 974 F. Supp. 2d 204, 217 (S.D.N.Y. 2013).

---

[32] There is, however, one inconsistency.  Defendant asserts in his affidavit that the customer contracts he e-mailed with his iMac desktop computer "which contain price and fee information," do not constitute confidential and proprietary information that belong to SmartStream" because pricing information is listed on the websites of the United States General Services Administration and the Securities and Exchange Commission.  (Aff. ¶ 5.)  These assertion stands in stark contrast to his deposition testimony about Def.'s Dep. Ex. 4, an addendum to a customer contract that he had e-mailed with his iMac desktop computer:  "Q: So is this document – I mean what it looks like to me, I just want to make sure I don't misunderstand it, it looks like this would be an example of part of a customer contract that addresses the fee from SmartStream?  A.  Yep.  Q.  And this is something that the customer and SmartStream would want to keep confidential?  A.  Of course, yes."  A party may not create a material question of fact simply by contradicting his own sworn deposition testimony.  *See Margo v. Weiss*, 213 F.3d 55, 60 (2d Cir. 2000). Accordingly, I disregard this portion of the affidavit.

### 3.  Trade Secrets Misappropriation Under the DTSA

The DTSA provides a federal cause of action for the misappropriation of trade secrets used in interstate commerce. Within the meaning of the DTSA, a trade secret is information, whether tangible or intangible, whose owner "has taken reasonable measures to keep such information secret" and which "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

SmartStream makes no attempt to show that the alleged trade secret "is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  Even if SmartStream had sufficiently proved this element, there is a genuine issue of material fact as to whether it kept the Corporate Q4 PowerPoint and/or its contents confidential.  Summary judgment must be denied on this claim.

### 4.  Punitive Damages

Because I deny summary judgment on SmartStream's state and federal claims of misappropriation of trade secrets, I decline to consider its request for punitive damages for those claims at this time.  Moreover, "[u]nder New York law, the decision to award punitive damages and their amount are questions which primarily reside in the jury's discretion."  *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 199 (S.D.N.Y. 2018), (quoting *Racich v. Celotex Corp.*, 887 F.2d 393, 397 (2d Cir. 1989)).

V.    **Conclusion**

For the reasons stated herein, SmartStream's motion to strike, (Doc. 86), is GRANTED IN PART AND DENIED IN PART.  Specifically, SmartStream's motion to strike is GRANTED with respect to Document 78-1 but DENIED with respect to Document 82.  SmartStream's motion for summary judgment, (Doc. 69), is also GRANTED IN PART AND DENIED IN PART.  Specifically, SmartStream's motion is GRANTED with respect to its (1) claim for breach of contract based on the making of the Mirror Image; (2) its claim for breach of contract with respect to Chambadal's retention of electronic copies of SmartStream documents until November 9, 2017; and (3) its request for a determination that it is entitled to attorneys' fees. SmartStream's motion is DENIED with respect to (1) its claim for breach of contract based on Chambadal's return of the MacBook and Blackberry on February 16, 2017; (2) its claim for breach of contract of Section 2 of the Employee Agreement, to the extent this claim properly raised; (3) its request for a specific award of attorneys' fees; (4) its claim of trade secrets misappropriation under state law; (5) its claim for federal trade secrets misappropriation under the DTSA; and (6) its request for punitive damages.  Plaintiff is directed to submit any request for a specific award of attorneys' fees at the conclusion of this action.

The parties are directed to appear for a post-discovery conference on November 1, 2019, at 10:30 a.m. in Courtroom 518 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.  The parties are further directed to submit a joint letter on or before October 18, 2019, setting forth proposed trial dates and the anticipated length of trial.

The Clerk of Court is respectfully directed to close the open motions at Docs. 60 and 86.

SO ORDERED.

Dated: September 30, 2019
        New York, New York

Vernon S. Broderick
United States District Judge